# BOESCH v. GRÄFF.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 1408. Submitted January 10, 1890.—Decided March 3, 1890.

The refusal of a circuit court to grant a rehearing is not subject to review here.

S., by an assignment absolute in form and for an expressed sum and "other valuable considerations," assigned to G. an interest in letters patent. G., by a writing executed the following day, made a further agreement with S. as to the times and modes and amounts of payments, and further agreed that if he should fail to carry out his said agreements, the title

was to revert to S.; *Held,* that the transfer was absolute, subject to be defeated by failure to perform the condition subsequent.

When an invention patented in a foreign country is also patented in the United States, articles containing it cannot be imported into the United States from the foreign country and sold here without the license or consent of the owner of the United States patent, although purchased in the foreign country from a person authorized to sell them.

To a master's report upon the damages to be awarded in an equity suit for the infringement of letters patent the exceptions raised the points: (1), that the infringement was not wilful; (2), that the reduction in price of the article manufactured by the plaintiff was not solely due to the infringement; *Held,* that this was sufficient to bring before the court the whole subject of the computation of damages.

When a plaintiff in a suit for the infringement of letters patent seeks to recover because he has been compelled to lower his prices in order to compete with the infringing defendant, he must either show that the reduction was due solely to the defendant's acts, or to what extent it was due to them, and must furnish data by which actual damages may be calculated.

IN EQUITY. The case is stated in the opinion.

*Mr. J. J. Scrivner* for appellants.

*Mr. John H. Miller* and *Mr. J. P. Langhorne* for appellees.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

Albert Gräff and J. F. Donnell filed their bill in the Circuit Court of the United States for the Northern District of California against Emile Boesch and Martin Bauer, to recover for infringement of letters patent No. 289,571, for an improvement in lamp burners, granted on December 4, 1883, to Carl Schwintzer and Wilhelm. Gräff of Berlin, Germany, assignors of one-half to J. F. Donnell & Co., of New York, all rights being averred to be now vested in the complainants. Claim 1 alleged to have been infringed reads as follows:

"In a lamp burner of the class described, the combination, with the guide tubes, of a ring-shaped cap provided with openings for the wicks, said cap being applied to the upper ends of the guide tubes, so as to close the intermediate spaces between the same, substantially as set forth."

The patent was granted December 4, 1883, but prior to that, November 14, 1879, January 13, 1880, and March 26, 1880, letters patent had been granted to Carl Schwintzer and Wilhelm Gräff by the government of Germany for the same invention. After a hearing on the merits, an interlocutory decree was entered, finding an infringement, and referring the case to a master for an accounting. The opinion will be found reported in 33 Fed. Rep. 279. A petition for a rehearing was filed and overruled. The case then went to the master, who reported that the infringement was wilful, wanton and persistent; that the appellees had sustained damages to the extent of $2970.50; and that they waived all claims to the profits realized by the infringement. Exceptions were filed to this report and overruled, and a final decree entered in favor of Gräff and Donnell for $2970.50, with interest, and costs, from which decree this appeal has been prosecuted.

Appellants urge three grounds for reversal:

First. That a title to the patent sufficient to maintain a suit for infringement was not at the date of filing the bill vested in the complainants.

Second. That Boesch and Bauer, could not be held for infringement, because they purchased the burners in Germany from a person having the right to sell them there, though not a licensee under the German patents.

Third. That the damages awarded were excessive.

These propositions are presented by some of the errors assigned, and are the only errors alleged which require attention, that which questions the infringement not being argued by counsel, and that which goes upon the refusal of the Circuit Court to grant a rehearing not being open to consideration here. *Buffington* v. *Harvey*, 95 U. S. 99, 100; *Steines* v. *Franklin County*, 14 Wall. 15, 22; *Railway Company* v. *Heck*, 102 U. S. 120; *Kennon* v. *Gilmer*, 131 U. S. 22, 24.

The assignment by Schwintzer to Albert Gräff was dated the 22d day of April, 1885, was absolute in form and transferred title to six twenty-fourths of the patent for the expressed consideration of "the sum of one hundred dollars and for other valuable considerations;" but a contract between Schwintzer

and Albert Gräff was produced by the latter upon his exam-
ination by the respondents, which read as follows:

"S. 1. Mr. Albert Gräff binds himself to pay to Mr. Carl
Schwintzer, instead of the, in the patent letter mentioned, one
hundred dollars for the first year, the sum of two hundred and
fifty marks, payable on the 1st February, 1886, and each fol-
lowing year on the same date the sum five hundred marks
(not less) till the amount of four thousand marks are paid in
all.

"S. 2. Should Mr. Albert Gräff, of San Francisco, not be
able to sell more than one thousand burners, called Diamond
or Mitrailleuse burners, No. 10,621, manufactured by Mess.
Schwintzer & Gräff, of Berlin, he reserves to himself to make
up a new agreement with Mr. Carl Schwintzer.

"S. 3. Should not Mr. Albert Gräff, San Francisco, against
all expectations, stick to the agreements mentioned in S. 1 and
2, all titles of the patent letter ceded to him by Carl Schwintzer
shall him return.

"S. 4. Mr. Carl Schwintzer, partner of the firm Schwintzer
& Gräff, engages to deliver to Mr. Albert Gräff the said burn-
ers at the same price as before, if the market price of the
metal does not exceed — make 150% kos., and promise likewise
to effect any order promptly, if in his power."

Albert Gräff testified in respect to the words, "instead of
the, in the patent letter mentioned, one hundred dollars for
the first year," etc., that they meant that, instead of the one
hundred dollars mentioned in the assignment, he was to pay
two hundred and fifty marks the first year, and that the con-
tract was made one day later than the assignment. Counsel
contends that the two documents must be construed together,
and amount simply to an executory contract to assign when
Gräff shall have paid the sum of 4000 marks; that, therefore,
Gräff could at most only be regarded as a licensee of the
interest under the patent, until such time as his contract should
be executed according to its terms; and that the legal right
as to six twenty-fourths of the patent remained in Schwintzer,
who was therefore a necessary party. It is evident that the
agreement was not drawn by parties well versed in English,

but their intention is sufficiently apparent. The assignment being absolute in form, conveyed the legal title, and on the next day the parties signed this contract, relating to the consideration, probably, to enable Albert Gräff to pay the 4000 marks out of the sales of the burners; at all events, it provides that if Gräff failed to carry out his covenants, then the title was to return to Schwintzer, which provision was in the nature of a security to him that he should be paid. The condition that if Mr. Albert Gräff did not, "against all expectations, stick to the agreements mentioned in S. 1 & 2, all titles of the patent letter ceded to him by Carl Schwintzer shall him return," is a condition subsequent. The title had already vested, but was liable to be defeated *in futuro* on failure of the condition. There has been no such failure, but on the contrary Albert Gräff has paid the 4000 marks in full. We shall, therefore, not reverse the decree on the ground first referred to.

Letters patent had been granted to the original patentees for the invention by the government of Germany in 1879 and 1880. A portion of the burners in question were purchased in Germany from one Hecht, who had the right to make and sell them there. By section 5 of the imperial patent law of Germany, of May 25, 1877, it was provided that, "the patent does not affect persons who, at the time of the patentee's application, have already commenced to make use of the invention in the country, or made the preparations requisite for such use." 12 Off. Gaz. 183. Hecht had made preparations to manufacture the burners prior to the application for the German patent. The official report of a prosecution against Hecht in the first criminal division of the Royal District Court, No. 1, at Berlin, in its session of March 1, 1882, for an infringement of the patent law, was put in evidence, wherefrom it appeared that he was found not guilty, and judgment for costs given in his favor, upon the ground "that the defendant has already prior to November 14, 1879 — that is to say, at the time of the application by the patentees for and within the State — made use of the invention in question, especially, however, had made the necessary preparations for its use. § 5, *eodem.* Thus

Schwintzer & Gräff's patent is of no effect against him,, and he had to be acquitted accordingly."

It appears that appellants received two invoices from Germany, the burners in one of which were not purchased from Hecht, but in the view which we take of the case, that circumstance becomes immaterial. The exact question·presented is whether a dealer residing in the United States can purchase in another country articles patented there, from a person authorized to sell them, and import them to and sell them in the United States, without the license or consent of the owners of the United States patent.

In *Wilson v. Rousseau*, 4 How. 646, it was decided that a party who had purchased and was using the Woodworth planing machine during the original term for which the patent was granted, had a right to continue the use during an extension granted under the act of Congress of 1836; and Mr. Chief Justice Taney, in *Bloomer v. McQuewan,* 14 How. 539, 549, says in reference to it, that "the distinction is there taken between the grant of the right to make and vend the machine and the grant of the right to use it." And he continues: "The distinction is a plain one. The franchise which the patent grants consists altogether in the right to exclude every one from making, using or vending the thing patented without the permission of the patentee. This is all he obtains by the patent. And when he sells the exclusive privilege of making or vending it for use in a particular place, the purchaser buys a portion of the franchise which the patent confers. He obtains a share in the monopoly, and that monopoly is derived from, and exercised under, the protection of the United States. And the interest he acquires necessarily terminates at the time limited for its continuance by the law which created it. . . . But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life stands on different ground. In using it he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when

the machine passes to the hands of the purchaser it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress."

In *Adams* v. *Burke*, 17 Wall. 453, it was held that "where a patentee has assigned his right to manufacture, sell and use within a limited district an instrument, machine or other manufactured product, a purchaser of such instrument or machine, when rightfully bought within the prescribed limits, acquires by such purchase the right to use it anywhere, without reference to other assignments of territorial rights by the same patentee;" and that "the right to the use of such machines or instruments stands on a different ground from the right to make and sell them, and inheres in the nature of a contract of purchase, which carries no implied limitation to the right of use within a given locality." Mr. Justice Bradley, with whom concurred Mr. Justice Swayne and Mr. Justice Strong, dissented, holding that the assignee's interest "was limited in locality, both as to manufacture and use." The right which Hecht had to make and sell the burners in Germany was allowed him under the laws of that country, and purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent. A prior foreign patent operates under our law to limit the duration of the subsequent patent here, but that is all. The sale of articles in the United States under a United States patent cannot be controlled by foreign laws. This disposes of the second error relied on.

This brings us to the consideration of the damages reported by the master, which report was confirmed by the court; and we are met on the threshold by the objection that the exceptions taken in the Circuit Court were not sufficiently specific to entitle appellants to raise the questions here upon which they submit argument.

These exceptions are as follows:

"First exception. For that the said master has in and by his said report certified on page six thereof that 'the cap was

the essential feature of the Gräff burner. The respondents adopted Gräff's arrangement, and then reduced the price of the burner, forcing Gräff to do the same in order to hold his trade. The evidence shows that the reduction in prices by Gräff was solely due to the respondents' infringement. So far as the evidence shows, the only competitors with Gräff in the use of his cap arrangement during the period covered by the accounting, were the respondents;' whereas the said master ought to have certified that respondents came innocently into possession of the burners by purchase in the ordinary course of business from legitimate manufacturers thereof in Germany, and that immediately upon being notified that they were claimed to be an infringement they ceased to sell the same. The evidence shows that at about the time Gräff made the alleged reduction in the price of his burners there were thrown upon the market lamp-burners of other kinds of equal or greater power, which came directly in competition with the Gräff burner, and that the reduction in price was the result of such competition; that the sale of 14 infringing burners by respondent in the course of three years' trade could not have been a sufficient competition to plaintiff's business to cause him to make a reduction of price, where the testimony shows that during the period from March 1st, 1886, when complainant reduced the price of burners, until October 31st, 1887, he sold about 6000 of said burners.

"Second exception. For that the said master hath certified 'that the amount of damages which the complainant has suffered and sustained from and by reason of said infringement is two thousand nine hundred and seventy dollars and fifty cents;' whereas he should have reported nominal damages.

"In all which particulars the report of the said master is, as the said respondent is advised, erroneous, and the said respondent appeals therefrom to the judgment of this honorable court."

It is conceded that these exceptions raise two points, namely, that the infringement was not wilful, and that the reduction of prices was not caused solely by it. And this, as it seems to us, is quite sufficient to permit the real question

involved to be passed upon. The master awarded $2970.50 as damages for the reduction in price, which, he holds, was caused by the respondents' infringement. He says :

" After the reduction in his prices, complainant sold, at wholesale, one thousand three hundred and twelve ten-wick burners, at a price twenty-five cents less on each than his original price ; four hundred and fifty twelve-wick burners, at fifty cents less ; five hundred and ninety-two sixteen-wick burners, at seventy-five cents less ; and seven hundred and sixteen twenty-wick burners, at seventy-five cents less ; a total difference between the original and the reduced prices of one thousand five hundred and thirty-five dollars and fifty cents.

" In addition, he sold at retail, on an average, five burners on each of the five hundred and seventy-four business days between the time when his prices were first reduced and October 31st, 1887 ; the number of burners thus sold being two thousand eight hundred and seventy, which were sold at a minimum reduction of fifty cents each under original prices — a total difference between the original and the new prices of fourteen hundred and thirty-five dollars ; which sum, added to the said sum of one thousand five hundred and thirty-five dollars and fifty cents, gives an aggregate amount of two thousand nine hundred and seventy dollars and fifty cents."

The report of a master is merely advisory to the court, which it may accept and act upon in whole or in part, according to its own judgment as to the weight of the evidence. *Kimberly* v. *Arms,* 129 U. S. 512, 523. Yet, in dealing with exceptions to such reports, " the conclusions of the master, depending upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part." *Tilghman* v. *Proctor,* 125 U. S. 136, 149. We think there was error here within that rule.

Where the patentee granted no licenses, and had no established license fee, but supplied the demand himself, and was able to do so, an enforced reduction of price is a proper item of damages, if proven by satisfactory evidence. *Yale Lock*

*Manufacturing Co.* v. *Sargent*, 117 U. S. 536. The damages must be actual damages, but where the patented feature is the essential element of the machine or article, as in the case just cited, if such damages can be ascertained they may be awarded. When, however, a plaintiff seeks to recover because he has been compelled to lower his prices to compete with an infringing defendant, he must show that his reduction in prices was due solely to the acts of the defendant, or to what extent it was due to such acts. *Cornely* v. *Marckwald*, 131 U. S. 159. There must be some data by which the actual damages may be calculated. *New York* v. *Ransom*, 23 How. 487 ; *Rude* v. *Westcott*, 130 U. S. 152.

The master reported "that the number of lamp burners proven to have been sold by respondents, containing the invention claimed in and by the first claim of complainants' letters patent, is fourteen, provided that only the capped burners sold contain said invention, and that the number is one hundred and fourteen, if the half-capped burners so sold are to be held to contain said invention."

The evidence established that the first invoice of lamp burners contained fifty 20-wick burners with caps, of which respondents sold four; and fifty 12-wick burners with half caps, of which respondents sold twelve; and fifty 16-wick burners with half caps, of which respondents sold forty-four; and that respondents altered the forty-six remaining 20-wick burners by changing their caps to half caps, and sold forty-four. This makes the one hundred with half caps, referred to by the master. Of the second invoice, the respondents sold four 20-wick capped burners and six 16-wick capped burners, making, with four 20-inch burners with caps sold out of the first invoice, the fourteen capped wick burners reported as thus disposed of. The original bill in this case was filed September 17, 1886. It had been preceded by another suit, which had been dismissed. The goods in the second invoice, it is testified, had been ordered before this suit was commenced, but the invoice is dated October 16, 1886. This invoice contained one hundred 20 and one hundred 16-wick burners with caps, of which respondents sold four 20-wick and six 16-wick burners unchanged as before

stated. Most of this lot were still on hand at the time the testimony was taken, though some had been altered into what was called the "Boesch burner," which had no caps at all, and sold as such.

The evidence tends to establish a profit of $1.85 on the 20-wick burners; $1.50 on the 16-wick; and 75 cents on the 12-wick. This would show a profit of $23.80 on the fourteen capped burners, being eight 20-wick and six 16-wick burners; and a profit of $156.40 on the one hundred half capped burners, being forty-four 20-wick, forty-four 16-wick and twelve 12-wick burners. Respondents had been advised by their counsel that the burners with half caps were not an infringement. The cap was the invention in question. The claim infringed, as already seen, was a combination, with the guide tubes, of a ring-shaped cap provided with openings for the wicks, said cap being applied to the upper ends of the guide tubes, so as to close the intermediate spaces between the same. The half cap admitted the air directly to each wick, and in that respect differed from the claim of the patent. It is argued, however, with much force on behalf of the appellees, that the difference was a difference in degree and not in kind, as the air reached the wick when the full cap was used, and the functions of the latter as a strengthening band, a protector of the tops of the tubes, and in other particulars, were performed by the half cap; and this position is not resisted by counsel for appellants. But assuming that the sale of one hundred burners with half caps was an infringement, we are not prepared to concede that the sale of one hundred and fourteen burners under the circumstances detailed could have had the effect in compelling a reduction of price which has been ascribed to it.

It is remarked by the master that "it is a fact of common knowledge that there is to be found on sale in the market a great variety of lamp burners, among which, as shown by the evidence, have been for many years burners of the same general class as complainants'." This being so, and Boesch & Bauer being dealers in burners generally, it is not to be presumed that Graff reduced his prices, for nineteen months,

on six thousand burners, not on account of competition in burners, but because of the effect upon his particular burner created by the sale of fourteen of the same kind, and of one hundred differing but the same in principle. Conceding that as Gräff granted no licenses, and had no established license fee, but supplied the demand for his burner himself, and was able to supply that demand, and that, therefore, if he was compelled to lower the price by the infringement he could recover for the loss thus sustained, does the evidence satisfactorily establish that the reduction in prices was due solely to the acts of the defendants in infringing? The opinion of Mr. and Mrs. Gräff to that effect is not sufficient, and even that is so qualified as to fall far short of expressing it. The master allowed upon 3070 burners sold at wholesale, and on 2870 sold at retail, by the complainants, between March 1, 1886, and October 31, 1887, or 5940 in all. The sales of one hundred and four out of the one hundred and fourteen sold by the respondents apparently took place prior to the filing of the bill. Boesch had been in the business for twenty years. The firm of Boesch & Bauer carried a large stock of lamps, embracing a hundred varieties in styles and sizes, under a very large variety of names.

Gräff's burner was a "mitrailleuse" burner, and called "Diamond" as the Miller burner was. Boesch testified that there was no difference between the selling price of the Hecht, the Miller, and the Boesch burners; that there was no demand in their trade for a mitrailleuse burner with a cap; and that in his judgment the Boesch burner was better than the Hecht. This evidence may properly be considered in connection with the fact that but one hundred and fourteen were sold.

We cannot concur with the conclusion that the result of the sales of the one hundred and fourteen burners was to keep Gräff's prices for his particular burner down from March 1, 1886, to October 31, 1887. If Boesch and Bauer had a burner which satisfied the public just as well as Gräff's, and which they could sell cheaper, Gräff cannot complain of the consequences. If Gräff's burner was so much better than

any other that the public must have it he could make his own price, and, if within the bounds of reason, find a sufficient market.

In the state of the case disclosed by this record, the complainants must be content with the protection of an injunction and a recovery of the profits realized from the infringing sales.

*The decree is reversed and the cause remanded for further proceedings in conformity with this opinion.*