OSMOSE WOOD PRESERVING CO. OF CANADA, Limited, v. OSMOSE WOOD PRESERVING CO. OF AMERICA, Inc.

Civil Action No. 1481.

District Court, W. D. New York.

Oct. 2, 1947.

On Rehearing Nov. 14, 1947.

436

Charles W. Parker and Max D. Farmer, both of Buffalo, N. Y. (Albert R. Henry, of Buffalo, N. Y., of counsel), for plaintiff.

Bean, Brooks, Buckley & Bean, Michael M. Cohn, Edwin T. Bean, and Malcolm K. Buckley, all of Buffalo, N. Y., for defendant.

KNIGHT, District Judge.

The plaintiff is a Canadian corporation; the defendant, a New York corporation. This suit is brought for the specific performance of, and an accounting under, an agreement entered into between the parties at Montreal, Quebec, on February 26, 1940. The defendant denies liability and counterclaims alleging non-performance by the plaintiff. The parties are, and for several years antedating the making of such agreement have been, engaged in the exploitation of inventions related to methods for the preservation of wood by "osmotic pressure" and the composition of materials for use for such preservation.

The treatment of wood to prevent decay is old in the art. Before the introduction of the "osmotic pressure" process, ordinarily, chemicals, such as creosote, zinc chloride, sodium fluoride, or the like, were applied to the timbers, and penetration attempted to be effected by the use of mechanical forces, such as vacuum, heat and external pressure. The idea was to refill the voids occupied by

the sap removed in drying. By such means penetration was not effected to any considerable depth and the desired benefits not fully obtained.

Carl Schmittutz, in Germany, had for many years been experimenting in wood preservation methods. He discovered that wood, when sap or moisture laden, by the application of certain chemicals in solution, could be penetrated right to the heart. He reversed the method of approach theretofore employed. "Osmosis" is defined as "A kind of diffusion which takes place between two miscible fluids separated by a permeable partition, * * *." The theory back of this proposal was that through "osmotic" or natural pressure, molecules in solution would be transferred through a permeable membrane—in moisture or sap laden wood. Schmittutz, in his patents, proposed a composition consisting essentially of sodium fluoride, sodium bichromate, dinitrophenol, and a binder. This was made into a paste and applied on the wood and drawn in by osmotic action. His invention was based on the method of getting mycocide salts into green or sap laden wood.

These discoveries brought great commercial success. Prior to 1940, the General Osmose Corporation, a Delaware corporation, acquired title to the United States and Canadian patent rights to the Schmittutz inventions for the method for preserving wood through "osmotic pressure" and the composition of matter for that purpose. The parties to this action then were the exclusive licensees respectively for Canada and the United States. In 1939, the defendant company acquired title to all of these patents, and, thereafter, under the agreement hereinbefore mentioned, assigned the Canadian rights to the plaintiff.

The Schmittutz' discoveries were concerned with moisture laden wood in its natural state and not with wood which had become dry. A handicap to the full commercial success of the "osmotic" method was apparent. Necessarily a great amount of dry timber must be offered for treatment. This was recognized by Schmittutz, and he proposed that dry wood, prior to treatment, be soaked in water. This did not bring about the desired results, since the dry timber did not absorb the moisture sufficiently, and the solution, or composition, utilized did not penetrate any considerable depth.

Prior to said agreement, plaintiff, as licensee, was selling "Osmosar," a preparation following the patentee's formula and claimed to be specially adapted for use in species of wood which do not lend themselves to other mechanical pressure treatments. Plaintiff, also, had its "Osmo-Creo" (Patent No. 411,809) and defendant its "Osmoplastic" (U. S. Patent No. 2,344,019) compositions showing an improvement over the original Schmittutz inventions in that they incorporated the salts of his inventions in a binder of tar or pitch.

When the aforesaid agreement was entered into, both parties were actively exploiting "osmotic" compositions based on the Schmittutz patents, as licensees as stated. Their products were comparably the same. The agreement definitely shows the intent of cooperation to the mutual benefit of the parties.

Paragraph 7 reads:

"During the life of the patents which are the subject matter of these presents, the Purchaser covenants that it shall not enter the field of wood preservation, directly or indirectly, in the United States of America, and the Vendor covenants that it shall not enter the field of wood preservation, directly or indirectly, in the Dominion of Canada."

In 1942 the United States and the Dominion of Canada were engaged in the construction of the so-called "Alcan Highway," then to be extended from British Columbia, Canada, into Alaska, an overall distance of approximately 1600 miles. A great quantity of timber was required for the building of bridges, guard fences, telephone poles and other facilities. Most of this was to be taken from the highway. Treatment for its preservation was necessary, and the "osmose" compounds were fitted for this use.

The plaintiff had its representative in the Western field, and as early as September, 1942, it began to sell its "Osmosar" for use in the treatment of bridge timbers. This representative was also then endeavoring to sell "Osmo-Creo" for use for treatment of the telephone poles. At approximately the same time, the defendant was

also, through the United States Signal Corps, soliciting the sale of its ".Osmoplastic" for use for the same purpose on that highway. Defendant submitted a bid for the materials at the price of $2 per gallon. In the meantime, and shortly before the letting, the plaintiff learned of defendant's efforts, and it submitted a bid for its preservatives. Defendant got the order. The evidence is conclusive that the officers of the defendant company knew its materials were to be shipped to Canada to be, in a large part, used in the treatment of telephone poles on the Canadian portion of the highway. Defendant entered plaintiff's field—directly—in violation of the specific terms of the quoted paragraph. The fact that the sale was made in the United States is not material in the light of the agreement. Boesch v. Gräff, 133 U.S. 697, 10 S. Ct. 378, 33 L.Ed. 787. Under defendant's contention the agreement as to that claim would be a nullity. Plaintiff has sustained damages by reason thereof.

▮ The agreement provided that the parties would continue to exchange sales literature, technical information, and like matters, for the free use by the other in its own country; and that each would make available to the other "full information and copies of any patent applications" respecting improvements or developments immediately on obtaining it. Article 9 reads:

"If any improvements or developments have been made or acquired, or are discovered or acquired at a later date, by the Vendor or any of its employees, during the life, renewal or continuation of any of the Letters Patents of the Dominion of Canada, hereby acquired, full information and copies of any patent applications regarding same shall be immediately communicated in writing to the Purchaser for its free use in the Dominion of Canada, and the Purchaser at its discretion and expense may instruct the Vendor to cause application to be made for Canadian Letters Patents on any such improvements or developments, and which shall be, upon application, assigned to the Purchaser."

The mutual reciprocal covenant is set forth in Article 10.

It is plaintiff's contention that defendant failed to communicate information regarding new patent applications and to give full information respecting improvements and developments in other respects.

A patent application for "Osmosalts" (U.S. Serial No. 325,745) was filed a month after the agreement was made. The application and assignment to defendant were executed on March 2, 1940. This application shows some change from the original concept of Schmittutz. It is undenied that the application was not revealed to plaintiff when the agreement was made. The subject matter must have then been known to defendant. The original "Osmo-plastic" application was filed both in the United States and Canada, prior to the agreement in suit, and the original Canadian application passed to the plaintiff by the agreement. In 1941, the original application was abandoned by defendant and a substitute application filed in the United States. This was not communicated to plaintiff till the substitute application became a patent in March, 1944 (U.S. Patent No. 2,344,019). The United States patent for "Osmo-plastic" contains eight claims and refers to "moisture addition." The Canadian patent contains only three claims and makes no reference to "moisture addition." The former differs in language in other respects. In June, 1941, defendant filed an application for "Osmoplastic Paint," but this shows nothing novel over plaintiff's "Osmose Paint" of which the defendant had been advised in 1940. The criticism directed to this is that the defendant had some ulterior motive in filing the application, possibly on the theory of carrying the invention date back to the earlier applications. Plaintiff first learned of this application in 1945.

In February, 1942, defendant filed an application for "Resin-Osmose." This concerns the addition of resin to the previously patented Osmose formulæ. It was first disclosed to plaintiff in 1945. Shortly after plaintiff, in January, 1943, had notified defendant it considered that the agreement had been breached, the defendant filed in Canada an application for "Osmosalts."

In August, 1944, defendant filed U. S. Patent application, Serial No. 548,145, for

what it termed its "moisture addition process." This was not disclosed to the plaintiff until 1945. It purports to describe a method of pre-treating "case-hardened" wood that has a uniform moisture content throughout, making it susceptible for treatment by the Osmose formulæ. The evidence definitely shows that Bostrum, defendant's employee, as early as 1939 was seeking a process for adding moisture to dry timber by the application of hot and cold water in a manner not theretofore employed. All attempts theretofore employed to get sufficient moisture into the wood were practical failures. As early as 1940, Bostrum reported to the defendant that "woods which have been laying around" could be treated commercially. He continued his research into 1944. It seems clear that the "moisture addition process" was reduced to practice shortly before or around February, 1940. The application is still pending. That there was novelty in the method demonstrated by Bostrum in this application hardly lies with the defendant to dispute. The record definitely shows Bostrum believed it patentable. Defendant's patent attorney as early as 1941 reported that he could find "no substantial anticipation of this process," and this was communicated to the President of defendant. In 1941 the defendant offered this improved process for sale by an offer to the Island Creek Coal Company in August, 1941, to treat the company's timbers by erecting and operating a plant for that purpose, and as early as 1943 a contract was made with the Coal Company for treatment by the defendant of timbers by the use of this new process. In the use of the process, the timber was sealed in a retort and subjected to steam and a solution of the preservative salts injected into the timber while it was in the retort. The Bostrum process has been a commercial success. It met a long-felt need in the preservation of timbers in a dry state.

Under the common hot and cold treatment method theretofore employed, the timber was placed in a hot solution at approximately 160° to 180° temperature, left there for three or four hours and transferred when hot in a tank containing cold solution. It took from 10 to 12 hours to complete this treatment but as a result the quantity of preservatives introduced into the wood was insufficient. Under Bostrum the idea was to add moisture to the wood and then proceed with the treatment with the Osmose process formulæ. Sufficient quantities of preservatives could be injected into the wood and the process completed in about two hours.

Whether this process was a novel development in the art and patentable is not necessarily material. Under the provisions of the agreement the obligation was on the defendant to keep the plaintiff advised of improvements and developments. This obligation was not met.

■ Defendant asserts that the plaintiff breached its contract in offering for sale its composition in the United States for use on the Alcan Highway. It apparently bases this claim on the provisions of Paragraph 8 of the agreement. It seems clear that this paragraph was intended to refer to the selling, offering for sale or marketing in countries outside of the United States where the Schmittutz patent had not lapsed. Protection for the defendant from entry by plaintiff into the United States field was intended to be given by Paragraph 7. If the plaintiff had the exclusive rights in Canada and the sale was for use there, there could be no encroachment on defendant's rights. Plaintiff was not entering the field of wood preservation in the United States.

■ Defendant asserts that plaintiff breached the agreement in the sale of its "Osmosar" to the Chilean Exploration Company. In 1943, plaintiff received in Montreal an order for 200 pounds of this product, and this order was filled in Montreal, shipped in customs bond to New York and from thence to Chile. If any of the Schmittutz patents then existed in Chile, such sale would be a violation of Paragraph 8, supra. There is no showing that such was the fact. The order was relayed from New York. There was no violation.

Hoffmann, an officer of the plaintiff, on October 22, 1938, filed an application for a patent in Canada for a wood preservative. The evidence shows that plaintiff never had any interest in that in 1940 when the agree-

ment was made and had theretofore waived all rights to an interest. Plaintiff had a product called "Pentox" and another "Osmose-Paint." A question is raised as to whether it is a "wood preserving product," but, however that is, it appears that both of these were disclosed to defendant as early as 1940.

The plaintiff claims damages in the total of $93,577.07. This is based on a detailed estimate of loss of profits through the failure to disclose promptly the moisture addition method; loss of profits in the Alcan Highway material sale and penalties of $500 for each of six alleged breaches of the agreement. By the terms of the agreement, the applicable law is the Quebec law. No material difference, however, is seen in the New York law. The parallels are shown in these sections:

Re-statement, 314:

"A failure, without justification, to perform all or any part of what is promised in a contract, is a breach thereof."

Civil Code of Lower Canada, Art. 1065:

"Every obligation renders the debtor liable in damages in case of a breach of it on his part."

■ The measure of damages, generally speaking, is the loss sustained. Art. 1073, Lower Canada Civil Code; Williston on Contracts, Sec. 1356. In many instances loss is provable with exactness. In many it is not and, to a greater or less extent, speculative. Here no trouble is seen with respect to the penalty provision of the agreement. Paragraph 12 reads:

"Any breach of the covenants of this agreement shall be assessable in damages provable in respect thereof, and shall entail, in addition, a penalty of $500.00 for each breach."

■ The penalty is distinctly separated from the other stated liability. While no case specifically in point in Canada or New York has been found, the conclusion from the Canada Civil Code provisions, Arts. 1076 and 1135, and Canadian authorities, is here drawn that the parties may provide for the payment of a penalty for breach of contract in addition to damages for such breach. "A contract is a law which the parties to it make for themselves, and it is applicable to the cases, and only the cases for which they specially provide." Ottawa Northern and Western Ry. Co. v. The Dominion Bridge Co., 14 King's Bench Reports (Quebec) 197. "Parties capable of contracting may contract with respect to any subject matter which is not contrary to good morals, public order, or otherwise, illicit." LaJeunesee v. Montreal Star Publishing Co., 47 King's Bench, 296. No prohibition against the enforcement of the penalty provision is found in domestic law. The plaintiff has sufficiently established the breach of the agreement by the defendant in four separate instances, and, therefore, is entitled to recover $2,000 by reason of the penalty provision.

■ In the matter of assessing damages for the breach of the agreement as respects the Alcan Highway, no great difficulty is found. These necessarily must be proximate. The plaintiff has sought to establish its loss based on the price at which it offered to sell the material—$16,319.12. It claims an additional profit on the solution, "Osmo-Creo," of $6,480.93 and on the bandages of $1,286.14, or a total of $7,767.07. These are exclusive of any liability under the penalty clause. While these figures may find support in the evidence of the cost accountant called by the plaintiff, they are so disproportionate as to destroy credulity. There are so many possible factors which were not given consideration.

The sale was made by the defendant for $13,450. The latter was evidently made low in order to underbid plaintiff, and it may fairly be assumed that, under the conditions, it was near the cost price of production. On this basis, plaintiff's damage was the difference between the two sales offers, or $2,869.12.

■ When we come to the question of damages by reason of the failure to disclose the "moisture addition" developments, we are confronted with a much more difficult problem. Mathematic calculation of damages to a degree of exactment seems quite impossible. Plaintiff asks damages in the amount of $181,940. The claim of the plaintiff appears most unreasonable. These two companies through from 1942 to

1945 had comparatively the same volume of business, and their gross and net profits did not differ greatly. The plaintiff's total net profits in 1942, 1944 and 1945 were $14,605; the defendant's $3,525. The figures for 1943 are not shown. The "moisture addition" process as developed by defendant is a proved success commercially. There certainly is a large field for its use in Canada, and perhaps larger than in the United States. But there are large enough fields throughout the world to utilize the capacities of both companies. Plaintiff still has the right to file an application for a patent on the process in Canada. As to the period dating from 1944, when the application for a patent for the moisture proof addition was filed, the plaintiff is entitled to an award of some damage. Such award cannot be purely speculative. On the other hand, damages are not required to be proved to a mathematical certainty. Excelsior Motor Mfg. & Supply Co. et al. v. Sound Equipment, Inc., 7 Cir., 73 F.2d 725. Assuming disclosure had been made to plaintiff in 1944, it would have taken some considerable time for plaintiff to have gotten into production and distribution. Plaintiff asserts the method of computating its damages is to ascertain, as far as possible, the unit profit per thousand or million board feet, and carry that forward against the total amount of timber which it could have treated, had the improvement been disclosed. We can determine substantially the amount of timber treated and solution sold by defendant during those years, but it is only a conjecture that the plaintiff could have sold and treated as much more. Plaintiff says the "cost to the consumer of the requisite 21 lbs. of Salts per thousand board feet is $9.00 and that in Canada the profit on this item is $6.06." When the seller treats the timber there is an additional profit totaling of $7.38. It is mere speculation that the plaintiff could have sold material for use on 4,500,000 board feet of lumber. Plaintiff says its figures are "possibly startling at first impression." So they are as a last impression. A great mass of detailed computations have been given through the cost accountant presented by plaintiff, but the sum total of it all is that it is based on too many elements of uncertainty.

The claim of the large profit in the sale of plaintiff's products invites little consideration, when, in 1942 its gross sales were $138,576, and net profit $3,516, in 1944, the gross sales were $127,453 and the net profits $1,869; and in 1945, $207,822 gross and $9,220 net profit. Little reliance can be placed on such patently wrong estimates.

The defendant breached the aforesaid agreement between it and the plaintiff in that it withheld from the plaintiff information in its activities in connection with the development of the "moisture addition" process. It is believed that a reasonable allowance as damages to the plaintiff on this account is $7,500. This is computed on the basis of $2,500 for each of three years.

The total award to the plaintiff for damages and penalties is $12,369.12, with costs. The plaintiff is entitled to an injunction restraining defendant from further acts in repudiation of the agreement. Let findings be submitted.

## On Rehearing

A deduction in the amount of the award heretofore made should be made in the amount of $443.46 because 850 gallons of osmoplastic were shipped to Alaska.

I adhere to my decision with respect to the amount of damages on account of the penalty provisions of the agreement between the parties; the damages by reason of Alkan highway sale and damages by reason of the withholding of the moisture addition process.

Interest on the total award is to be computed from the date of the decision to the date of the entry of the judgment, at 5%. Sec. 480, N.Y.Civil Practice Act.

The judgment is payable in United States funds.