STATIC CONTROL COMPONENTS,
INC., Plaintiff/Counterclaim
Defendant,

v.

LEXMARK INTERNATIONAL, INC.,
Defendant/Counterclaim
Plaintiff,

v.

Ner Data Products, Inc., et al.,
Counterclaim Defendants.

Nos. Civ.A. 5:02–571, Civ.A. 5:04–84.

United States District Court,
E.D. Kentucky,
Central Division at Lexington.

May 18, 2007.

Mark T. Banner, Timothy C. Meece, Binal J. Patel, Matthew P. Becker, Michael L. Krashin, Christopher B. Roth, all of Banner & Witcoff, Ltd., Chicago, IL, Steven B. Loy, Hanly A. Ingram, of Stoll Keenon Ogden PLLC and Andy Copenhaver, Hada Haulsee of Womble Carlyle Sandridge, Lexington, KY, for Defendant/Counterclaim Plaintiff Lexmark International, Inc.

## ORDER

VAN TATENHOVE, District Judge.

The Court takes up for consideration the claims of fourteen patents at issue in this suit that have contested constructions for the purpose of construing those claims.[1] The parties have filed a joint claim construction brief [R. 919]; opening briefs [R. 966 (Static Control, Pendl, and Wazana), 949 (Lexmark)]; responses to the opposing parties' opening brief [R. 1007, 1010]; and replies [R. 1023, 1025].

## I.

## BACKGROUND

Briefly, the status of the parties is as follows: Lexmark is a large producer of printers and toner cartridges for its printers. SCC is "a leading supplier to toner cartridge remanufacturers." [R. 172 at 16, Case No. 5:02–571]. The remanufacturers, which include the other Counterclaim Defendants in this case, take used toner cartridges, repair them, refill the toner, et cetera and resell the cartridges to end-user consumers. SCC sells to the remanufacturers parts and supplies for reworking the used toner cartridges, such as replacement parts, toner, and microchips. [R. 1].

Lexmark and SCC first began litigation in this Court in 2002 when Lexmark filed suit against SCC, alleging, *inter alia,* that SCC's sale of "SMARTEK" microchips infringed on Lexmark's copyrighted "Toner Loading Programs." [R. 1, Case No. 5:02–571]. In 2004, SCC filed a declaratory judgment action, alleging, *inter alia,* that its new "re-engineered" microchips did not infringe on any of Lexmark's copyrights. [R. 1, Case No. 5:04–84]. The cases were ultimately consolidated with Case No. 5:04–84 as the lead case, and all citations in this Order refer to that lead case unless

otherwise noted. [R. 140]. Lexmark filed a Counterclaim/Third Party Complaint to the 2004 litigation initiated by SCC, in which it alleged patent claims against SCC and the Counterclaim Defendant remanufacturers to this case. [R. 67]. These patent claims in Lexmark's Counterclaim form the basis of the claim construction process in which the Court currently engages.

The primary, though not only, theory on which Lexmark alleges direct patent infringement against the remanufacturers and active inducement of patent infringement against SCC is predicated on Lexmark's use of single-use restrictions on the majority of its cartridges at issue. These "restricted" cartridges have been commonly referred to as "Prebate cartridges" for the reasons that follow: Lexmark runs what it called at one time its "Prebate Program" and what now is referred to as the "Lexmark Return Program." [R. 594 at 3, n. 4]. In that program, Lexmark's customers buy printer cartridges at an upfront discount in exchange for the customer agreeing to use the cartridge only once and then return the empty cartridge only to Lexmark. According to Lexmark, Lexmark offers " '[r]egular' toner cartridge[s] for those customers who do not choose the Prebate/Cartridge Return Program toner cartridge[s] with [their] terms." [R. 2 at 8]. Therefore, "Prebate" is temporally the reverse of a rebate.

Over the years, the precise language of Lexmark's Prebate terms printed across the top of Prebate cartridge boxes has varied. [*See, e.g.,* R. 573 at 3]. However, currently the terms read:

RETURN EMPTY CARTRIDGE TO LEXMARK FOR REMANUFACTURING AND RECYCLING

---

1. There were originally sixteen patents at issue in this suit; however, the Court determined that two of Lexmark's design patents were invalid and thus only fourteen patents in suit are currently relevant for purposes of claim construction. [R. 1008].

Please read before opening. Opening this package or using the patented cartridge inside confirms your acceptance of the following license agreement. This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling. If you don't accept these terms, return the unopened package to your point of purchase. A regular price cartridge without these terms is available.

[R. 594, 3–4 (Lexmark has provided the Court with a demonstrative cartridge and cartridge box with the above Prebate language, as Lexmark represented that it would at Record 519 at 9, n. 13) ]. Including English, these terms are printed in six different languages. *Id.*

Lexmark's second theory of direct patent infringement is predicated on the idea that the first sale of cartridges in foreign nations does not exhaust Lexmark's patents on those cartridges in the United States. *See Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094, 1105 (Fed. Cir.2001) (citing *Boesch v. Graff,* 133 U.S. 697, 701–703, 10 S.Ct. 378, 33 L.Ed. 787 (1890)). Accordingly, Lexmark argues that regardless of whether a single use restriction reads on its cartridges, the Counterclaim Defendant remanufacturers of printer cartridges infringe upon the patents that read upon cartridges originally sold overseas by reselling them without license in the United States.

## II.

## DISCUSSION

### A. Principles of Claim Construction

■ The current exercise the Court undertakes is that of claim construction. Title 35 U.S.C. § 112 requires that the written description of the invention, or "specification," in the patent, "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed.Cir.2004) (citing *Aro Mfg., Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 339, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961)). Determining the scope and meaning of a claim is solely a matter of law for the Court to decide. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

Claim construction has two practical implications. First, construing the claim enables a fact finder to determine whether a patent may be invalid for failing to meet requirements of patentability. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed.Cir.2001). The Court has already held that nine of the fourteen patents considered here are valid. [R. 1008 at 6–7]. In response to Lexmark's motion for validity on the nine patents, the opposing parties offered not even a scintilla of argument, let alone evidence, that any given claim was invalid for whatever reason. *Id.* This was despite the fact that the opposing parties knew precisely those ninety-three claims which Lexmark alleges were infringed. *Id.* Therefore, validity is only at issue with regard to the remaining five patents. The second function of claim construction is to determine whether an alleged infringer infringed on a patent by doing that which is covered by any of the patent's claims. *Amazon.com, Inc.* 239 F.3d at 1351.

The courts, especially the Court of Appeals for the Federal Circuit, have developed a body of law that instructs on how claims should be construed. The language

of the claim itself is of paramount importance:

> We begin our claim construction analysis, as always, with the words of the claim. The claim language defines the bounds of claim scope. "The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." "The language of the claim frames and ultimately resolves all issues of claim interpretation."

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed.Cir.2002) (citations omitted). That is not to say that the words of the claim are construed without reference to additional information.

■■■ One case, *Phillips v. AWH Corp.*, is particularly well known for outlining the process of claim construction. 415 F.3d 1303 (Fed.Cir.2005). First, "[t]he words of a claim 'are generally given their ordinary and customary meaning,'" which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of ... the effective filing date of the patent application." *Id.* at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996)). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed.Cir.2001)). When determining the meaning of claim terms and phrases, intrinsic evidence, consisting of the patent itself, including the specification and claims therein, and the prosecution history, if submitted, is the "the most significant source of the legally operative meaning of disputed claim language." *Vitronics*

*Corp.*, 90 F.3d at 1582. The specification is usually dispositive to the claim construction analysis. *Id.* The Court may also utilize extrinsic evidence, such as expert testimony and general or trade dictionaries, to assist in construction, but such evidence is subordinate to and may only be used to clarify intrinsic evidence. *Phillips*, 415 F.3d at 1317–18. Typically, repeated words or phrases in the patent are construed to have the same meaning. *Id.* at 1314.

A patent claim is introduced with a preamble. For instance, Claim 1 of Lexmark's Patent No. 5,634,169 begins with the preamble, "A cartridge for an electrophotographic machine," followed by the transitional term, "comprising," and then by the body of the claim. [R. 966, Attach. 1]. A preamble may or may not contain language that limits the claimed invention. Whether the preamble limits is an issue that the Federal Circuit addressed in *Pitney Bowes, Inc. v. Hewlett–Packard Co.*:

> If the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is "necessary to give life, meaning, and vitality" to the claim, then the claim preamble should be construed as if in the balance of the claim. Indeed, when discussing the "claim" in such a circumstance, there is no meaningful distinction to be drawn between the claim preamble and the rest of the claim, for only together do they comprise the "claim". If, however, the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot

be said to constitute or explain a claim limitation.

182 F.3d 1298, 1305 (Fed.Cir.1999) (citations omitted).

Issues of claim construction additionally arise due to Paragraph 6 of Title 35 U.S.C. § 112. That section provides that:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The Federal Circuit has held when the Court should find that an inventor has invoked the means-plus-function format:

The use of the word "means" "triggers a presumption that the inventor used this term advisedly to invoke the statutory mandate for means-plus-function clauses." This presumption may be overcome in two ways. First, "a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, P 6." Second, "even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, P 6 does not apply." A claim term recites sufficient structure if "the 'term, as the name for structure, has a reasonably well understood meaning in the art.'" The mere use of the word "means" after a limitation, without more, does not suffice to make that limitation a means-plus-function limitation.

*Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1347 (Fed.Cir.2002) (citations omitted).

**B. The Parties' Arguments with Regard to the Claims in Issue**

Lexmark argues that all of the terms or phrases that have been marked jointly for construction are "simple and strait forward" and that no further construction of the terms is required or appropriate for "[a] person of ordinary skill in the relevant art" to know precisely what the claim limitations mean. [R. 949 at 5]. According to Lexmark, the unnecessary nature of claim construction in this matter is exacerbated by the Counterclaim Defendants failure to "yet provide their invalidity and non-infringement contentions, despite numerous Court orders to do so." *Id.* at 34.

The Counterclaim Defendants rebut Lexmark's argument by stating that the Court must resolve disputed claim constructions. By letting terms speak for themselves, the Counterclaim Defendants argue that Lexmark is improperly attempting to allow the jury to implicitly conduct its own claim construction. [R. 1007 at 1–3]. They continue, "Lexmark has defaulted. It has not advocated constructions of the disputed claim terms." *Id.* at 4. The Court disagrees. Rather, the Court believes that there is no real dispute with regard to many, if not most, of the claim limitations at issue.

A simple illustration should demonstrate the lack of real conflict in the current case: assume a claim limitation is the term "dog." One party argues that, based on intrinsic evidence, a "dog" must be construed as "weighing less than 50 lbs." Accordingly, that party argues that its accused dog is non-infringing because the accused dog weighs 30 lbs. This would be an exercise in construction. However, arguing that "dog" ought to be construed as "canine" is no construction at all. The terms are mere synonyms that leaves the Court to wonder what the point is. Under what circumstance would an accused dog infringe but an accused canine would not? Ultimately, there is no dispute in the first instance regarding the claimed term. This is exactly what SCC and the Remanufacturers have done over and over again with regard to their proposed claim construc-

tions. For example, they merely call a "sump" a "receptacle," or they call the "left side" the "region to the left of the center line."

The Court has nevertheless gone through the claim construction process as listed below in the following manner: with regard to some of the Counterclaim Defendants' proposed constructions, a practical effect of the construction, with potential infringement implications, is implicitly ascertainable, though admittedly speculative. Nevertheless, the Court has construed these terms. In other instances, this is not the case, and the Court reiterates that there is really no dispute at all. The Counterclaim Defendants' exhortation to attach a synonym to self-defined and simple words invites a meaningless result that mocks the notion of construction.

Finally, the Court addressed the necessity of a claim construction hearing in this matter at the Final Pretrial Conference on April 24, 2007. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). All the parties agreed that a claim construction hearing was unnecessary in this matter, except that the parties were amiable to a hearing if the Court thought it appropri-ate. The Court concurs with the parties that a hearing on claim construction is unnecessary, as this issue has been heavily briefed in writing on the record.

## C. Construction

 The Court below construes the terms or phrases in claims over which the parties disagree. The parties filed a joint claim construction brief at Record No. 919. In that brief, in table format, the parties listed the relevant claim limitation and then underlined terms over which there was dispute as to construction. In the next column, Lexmark submitted its proposed construction, and in a third column, SCC and the Remanufacturers submitted their proposed construction. In the below chart, the Court makes its own constructions of the claims, utilizing the above principles of claim construction and considering the parties' proposals. The Chart below is keyed to the parties' joint claim construction brief. [R. 919]. For instance, the parties listed some claim limitations which the parties agreed need no construction. The Court assumes this was done to put other claim limitations in context, and accordingly, the Court has duplicated the claim limitations for which "no construction [is] necessary" below:

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| **A. U.S. Patent No. 5,634,169 ("Cartridge with Encoded Wheel")** | |
| 1. A *cartridge for an electrophotographic machine*, comprising: | This is a preamble that merely states the purpose of or intended use of the cartridge. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed.Cir.1998). Therefore, the preamble is not a claim limitation requiring construction. *Id.*; *see also NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305–06 (Fed.Cir.2005). It would be inappropriate to construe the preamble to mean that the electrophotographic machine is part of claimed invention's purpose being for use in the machine. |
| a *sump for carrying an initial quantity of toner*; | Intrinsic evidence is sufficient to know what a "sump" is without external reference to Merriam–Webster Online for gloss. Why a |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| | "receptacle"? [R. 919 at 4]. Why not a reservoir or pit or well? *See http://www.m-w.com/ dictionary/sump.* Merely picking synonyms for words is not necessarily claim construction. "Receptacle" is no more defined than "sump." Furthermore, it is fantastical to the Court to believe that calling a "sump" a "receptacle" would have *any* practical effect to infringement issues in this case (or validity issues, if such issues were still relevant regarding this patent).<br><br>This limitation is construed as follows: "a sump carries a quantity of toner." |
| a shaft mounted for rotation in said sump, and a paddle mounted thereon in such a manner that when said shaft rotates, said paddle rotates therewith, into, through and out of engagement with toner carried within said sump; | Parties agree: No construction is necessary. |
| an encoder wheel mounted on said shaft, externally of said sump; *said encoder wheel positioned for mating coaction with a code wheel reader* when said cartridge is in a *home position in an electrophotographic machine*; and | The Counterclaim Defendants' construction implies that the claim limitation must be read as requiring a combination of a cartridge and printer to have effect. While a cartridge may require a printer to execute its intended function (and vice versa), the invention is structurally complete without the printer (See claim 1). Accordingly, this is not like a method claim, and the Court finds that there is really no dispute over the plain meaning of "said encoder wheel positioned for mating coaction with a code wheel reader."<br><br>SCC does not offer a construction of "home position," and thus the Court finds that that part of the limitation is not in substantive dispute, as the limitation speaks for itself. [R. 919 at 5]. |
| a torque sensitive coupling connected to said shaft for connection to a drive means in said machine, when said cartridge is installed in said machine, *to effect rotation of said shaft, paddle and encoder wheel*; | The meaning of "rotation of said shaft, paddle and encoder wheel" is self-evident. To the extent that the Counterclaim Defendants' proposed construction imposes a directional limitation on that rotation, such that the elements rotate in the "same direction," said claim is construed to have no directional or conjointly rotational limitation. |
| *said encoder wheel configured for indicating, in conjunction with said coded wheel reader, one or more cartridge characteristics to said machine.* | The Court finds no substantive difference between the parties' proposed constructions, and thus finds that this claim is not legitimately in dispute, except that the Court notes that "coded wheel reader" is not a claimed element here. |
| 2. A cartridge for an electrophotographic machine in accordance with claim 1, wherein said encoder wheel includes; | No construction is necessary. (Neither party proposes a construction or suggests that one is necessary in their joint construction brief. [R. 919 at 6].) |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| *means on* said encoder wheel for coaction with said code wheel reader on said machine to indicate a component of resistance to paddle movement through the portion of said sump having toner therein to give an indication of the amount of toner remaining in said sump. | This is a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6. The means for coaction covers slots, windows, notches, or reflective material and equivalents thereof. |
| 4. A cartridge for an electrophotographic machine in accordance with claim 1, including a section of said encoder wheel containing coded information indicating said one or more characteristics of said cartridge; | Parties agree: No construction is necessary. |
| said section positioned on said encoder wheel so that during *normal rotational operation in said machine by drive means in said machine*, said section is read by said code wheel reader prior to said paddle entering said toner material in said sump. | SCC's proposed construction is: "in normal rotation, the encoder wheel rotates with and in the same direction as the paddle." This is unnecessary, and irrelevant, gloss on how normal rotation ought to be. The Court therefore construes "normal rotational operation" to mean that "when the section positioned on the encoder wheel *is functioning as intended*, said section is read by said code wheel reader . . . ." |
| 5. A cartridge for an electrophotographic machine in accordance with claim 4, said encoder wheel including another section on said encoder wheel configured for coaction with said code wheel reader on said machine to signify *a component of resistance to paddle movement* through the portion of said sump having toner therein to give an indication of the amount of toner remaining in said sump. | The Court fails to see any practical difference between SCC's proposal, "an indication of resistence to paddle movement through the toner," and letting the limitation, "to signify a component of resistence to paddle movement," speak for itself. SCC's proposal is found to be superfluous and this limitation is found to not be in substantive dispute. |
| 6. A cartridge for an electrophotographic machine in accordance with claim 5, wherein: | Parties agree: No construction is necessary. |
| said encoder wheel is connected to one side of said torque sensitive coupling, by said shaft, and at one end of said cartridge, | |
| the other side of said torque sensitive coupling being adapted for connection to said drive means and at the opposite end of said cartridge, | Parties agree: No construction is necessary. |
| and said component of resistance is *measured by the lag between drive means travel and encoder travel*. | SCC proposes the construction that limits the claim to require that "the electrophotographic machine measures the component of resistence." Although this may be a practical reality, it is improper to read in limitations on an unclaimed device, the electrophotographic machine, here. This is not a method claim, and therefore, the claim should be construed such that: "the component of resistance is capable of being measured by the lag between drive means travel and encoder travel." |
| 23. A method of determining characteristics of a replaceable cartridge for an electrophotographic machine, said cartridge including a sump for holding toner therein and a paddle mounted for rotation within said sump, an | Parties agree: No construction is necessary. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| encoder wheel mounted externally of said sump and connected to said paddle for rotation therewith, said wheel having a plurality of slots therein, some of said slots being coded for indicating characteristics of the cartridge when rotated by drive means for reading by a code wheel reader on said machine, comprising the steps of: | |
| rotating said wheel and determining the home position of said wheel and the position thereon of encoded *slots* representing bits relative to the paddle in said sump of toner by counting drive means increments from a predetermined start or home position; | Claim 23 is not an asserted claim in this case. [See R. 1008 at 32]. Thus, no construction is necessary. |
| recording *increments to encoded slots* and stop window trailing edge; | Claim 23 is not an asserted claim in this case. [See R. 1008 at 32]. Thus, no construction is necessary. |
| subtracting an incremental count of said drive means as if no toner were in said sump from an actual incremental count to selected predetermined positions of said paddle in said sump containing toner to determine delay being measured in known distances traveled by said paddle under no toner to actual toner contained conditions; | Parties agree: No construction is necessary. |
| and determining from said difference the quantity of toner remaining in said sump. | Parties agree: No construction is necessary. |
| 32. A *cartridge for an electrophotographic machine*, comprising: | This is a preamble that merely states the purpose of or intended use of the cartridge. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed.Cir.1998). Therefore, the preamble is not a claim limitation requiring construction. *Id.*; *see also NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305–06 (Fed.Cir.2005). It would be inappropriate to construe the preamble to mean that the electrophotographic machine is part of the claimed invention, rather than the claimed invention's purpose being for use in the machine. |
| a *sump for carrying a quantity of toner*; | See claim 1 above. |
| a toner agitator mounted in said sump; and | Parties agree: No construction is necessary. |
| a single *encoded wheel rotating in relation to said toner agitator*, said encoded wheel including coding for determining a quantity of toner in said cartridge. | SCC proposes the construction: "the encoded wheel rotates with and in the same direction as the toner agitator. This proposal is rejected, because "rotating in relation to said toner agitator" is construed to have no limits on direction of rotation (i.e. the encoded wheel and agitator do not have to rotate conjointly). |
| 35. The cartridge of claim 34, wherein said wheel further comprises encoding for one or more *preselected cartridge characteristics*. | "Preselected cartridge characteristics" is construed as "static information about the cartridge." Lexmark argues that "static" is not a limitation here, because for example, information about the amount of toner in the cartridge is not static—it changes as toner is used. [See R. 949 at 106]. This argument has no merit, because the specification specifically |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| | classifies "the amount of toner remaining" information as something different than "preselected cartridge characteristics." Col. 5, lines 31–41 ("... for conveying ... to the machine information concerning cartridge characteristics including continuing data ... concerning the amount of toner remaining within the cartridge and/or *preselected cartridge characteristics*, such as for example, cartridge type or size, toner capacity, toner type, photoconductive drum type, etc.) (emphasis added). This evidence in the specification shows that preselected cartridge characteristics refer to static information. |
| 36. A toner *cartridge for an imaging apparatus*, the improvement comprising a wheel having coding representing one or more *preselected cartridge characteristics*. | See claims 1 and 35 above. |
| **B. U.S. Patent No. 5,707,743 ("Developer Roller")** | |
| 1. An endless developer member comprising | Parties agree: No construction is necessary. |
| a body of polycaprolactone ester toluene-diisocyanate polyurethane, a conductive filler, and polydiene, of a lower alkane | Parties agree: No construction is necessary. |
| said member having an *outer surface of oxidized polydiene of a lower alkane*. | SCC's construction is that the claim should be construed to mean that the surface layer of oxidized polydiene of a lower alkane has a thickness of 50–200 microns. Lexmark's joint construction proposal is that "'outer surface' should be construed to mean 'the outside, exterior boundary.'" [R. 919 at 13].<br><br>The specification indicates that 50–200 microns is a desired result: "By the correct combination ... a surface layer thickness of approximately 50–200 microns ... can be produced." Col. 4, lines 57–62. However, nothing suggests that 50–200 microns is an implicit limitation. Accordingly, the claim limitation is construed to mean an outer surface layer of oxidized polydiene of a lower alkane without regard to thickness. |
| **C. U.S. Patent No. 5,758,233 ("Locating Surfaces")** | |
| 1. A *toner cartridge for an imaging apparatus* comprising | This is a preamble that merely states the purpose of or intended use of the cartridge. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed.Cir.1998). Therefore, the preamble is not a claim limitation requiring construction. *Id.*; *see also NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305–06 (Fed.Cir.2005). It would be inappropriate to construe the preamble to mean that an imaging apparatus is part of the claimed invention, rather than the claimed invention's purpose being for use in the apparatus. |
| a toner hopper and a rotatable developer roller which receives toner in *controlled amounts* from said toner hopper mounted | A "controlled amount" speaks for itself, except that the specification informs that a controlled amount is not "excessive." Col. 9, |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| together as a *first unitary assembly* | lines 50–52. The Counterclaim Defendants urge the adoption of a construction, "advantageous amount," but that is no more defined than "controlled," and thus the Court rejects that construction. If the Court were to follow the Counterclaim Defendants' proposal, then the Court's construction would itself require construction. Neither party suggests or proposes that a "controlled amount" ought to be defined as a certain range of measurement and thus neither does the Court.<br><br>Regarding SCC/Reman.'s proposed construction of "first unitary assembly," nothing suggests that "unitary" in this context means "indivisible." SCC's word choice of "indivisible" is bootstrapped from a general dictionary, when the specification informs that the limitation of "unitary" is more akin to a requirement of being "attached together." Col. 8, Lines 24–30. Furthermore, the claim limitation itself defines what a "first unitary assembly" is. Lexmark's construction embodies this meaning, and thus the Court adopts that construction as follows: "a toner hopper and a rotatable developer roller are mounted together as a first unitary assembly and the developer roller receives toner in controlled amounts from the toner hopper." |
| a rotatable photosensitive roller having a central shaft, *a cleaner chamber for cleaning untransfered toner from said photosensitive roller*, and a cover member extending around and above said hopper mounted together as a second unitary assembly, | Construction: a cleaner chamber is included for use during cleaning of untransfered toner from the photosensitive roller. The chamber does not have to actually do the cleaning itself, because if that were the case, then the construction would exclude Lexmark's preferred embodiment. See Figs. 1 and 2, Nos. 27, 73. The "cleaning blade" actually scrapes toner from the photoconductor drum. Col. 4, line 65—Col. 5, line 4. The Court agrees with Lexmark that "a chamber for cleaning" has an analogous meaning to "a laundry room for washing clothes." [R. 949 at 64]. Because SCC's proposed construction might be read to require the cleaner chamber to actually perform the task of the blade, that construction is rejected. |
| a resilient member connected between said first unitary assembly and said second unitary assembly, to pull said developer roller and said photosensitive roller into contact, | Parties agree: No construction is necessary. |
| *locating surfaces* on opposite sides of said cartridge, said locating surfaces each comprising, | This is a structural claim element and SCC's proposed construction improperly imports unnecessary functional limitations, namely that the surfaces "firmly position the toning mechanisms of [the] cartridge when the cartridge is installed." *Transmatic, Inc. v. Gulton Indus.*, 53 F.3d 1270, 1278 (Fed.Cir.1995). While this may in fact be the purpose of the |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| | locating surfaces, the only limitation with regards to "locating surfaces" is that the surfaces must be comprised of at least those structural elements that follow this claim provision. Col. 18, Lines 21–29. |
| said central shaft of said photosensitive roller extending so that said central shaft is _unobstructed_ for serving as a vertical and _front to rear locator,_ | Without any indication to the contrary, the Court can only assume that "not impeded by any structure" is merely a superfluous synonym for "unobstructed." "Not impeded by any structure" places excessive reliance on a general dictionary, when the specification ought to be dispositive here. While SCC and the Remanufacturers argue that the Court "must construe disputed terms," simply swapping words with synonyms is not construction. Therefore, the Court finds that the claim limitation is not in dispute at all. |
| an elongated surface in the center of said cartridge having an upper surface unobstructed for receiving _downward pressing members from said imaging apparatus,_ | SCC's proposed construction, "an imaging apparatus that includes a structure that applies a downward vertical force," improperly makes the imaging apparatus part of the claim. Rather, the construction should be and hereby is the limitation's plain meaning: "an upper surface is unobstructed for receiving downward pressing members from the imaging apparatus (_e.g._, printer)." Therefore, the claim states the purpose of the "upper surface" but does not require that the upper surface to be in receipt of "downward pressing members" to have effect. |
| a flat ledge on a side of said hopper unobstructed for resting on a _roller member in said imaging apparatus._ | Like the limitation directly preceding above, SCC's construction—"an imaging apparatus that includes a cylindrical body revolving around a fixed axis—is inappropriate for its importation of the structure of the printer into the claim. As such, the Court merely construes this claim limitation as not claiming the imaging apparatus's structure. |
| **D. U.S. Patent No. 5,768,661 ("Wing-like Guides")** | |
| 1. _A toner cartridge for an imaging apparatus_ comprising | This is a preamble that merely states the purpose of or intended use of the cartridge. _C.R. Bard, Inc. v. M3 Sys., Inc.,_ 157 F.3d 1340, 1350 (Fed.Cir.1998). Therefore, the preamble is not a claim limitation requiring construction. _Id._; _see also NTP, Inc. v. Research In Motion, Ltd.,_ 418 F.3d 1282, 1305–06 (Fed.Cir.2005). It would be inappropriate to construe the preamble to claimed invention, rather than the claimed invention's purpose being for use in the apparatus. |
| a toner hopper, | Parties agree: No construction is necessary. |
| a developer roller which receives toner in _controlled amounts_ from said toner hopper, and | Construction: a developer roller receives toner in controlled amounts from the toner hopper. A "controlled amount" speaks for itself, except that the specification informs that a controlled amount is not "excessive." Col. 9, lines 13–26. The Counterclaim defendants |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| | urge the adoption of a construction, "advantageous amount," but that is no more defined than "controlled," and thus the Court rejects that construction. If the Court were to follow the Counterclaim Defendants' proposal, then the Court's construction would itself require construction. Neither party suggests or proposes that a "controlled amount" ought to be defined as a certain range of measurement and thus neither does the Court. |
| a photosensitive roller which is *toned by toner* delivered by said developer roller, | The parties agree and the Court concurs that this limitation is construed as follows: "a photosensitive roller (*e.g.*, a photoconductor drum) is toned by toner that is delivered by the developer roller." |
| said cartridge having *curved planar members* on opposite sides of said cartridge for guided movement by *slots in said imaging apparatus*, said planar members being substantially continuous for being guided by *substantially continuous* slots, | "[A] flat structure that deviates from planarity in a smooth, continuous fashion," SCC's construction of "curved planar members," is a superfluous synonym of clear terms, which under some circumstances (which are currently unknown to the Court) might serve to unjustly limit the claim.<br><br>The Counterclaim Defendants construction of "slots in said imaging apparatus," which is "an imaging apparatus that includes slots," is inappropriate because it limits an *unclaimed* apparatus (e.g. a printer).<br><br>The Court understands the "substantially continuous slots" to be illustrated by the unclaimed space formed by guides in a printer, Fig. 10, No. 293, 297. The Court sees no reason to import SCC's construction of "connected" because that begs the question, "connected to what?" It would certainly be inappropriate to somehow suggest that the members must be connected to the unclaimed slots. Rather, the claim itself makes clear that the purpose of the claimed "substantially continuous" members are to be guided by *unclaimed* substantially continuous slots.<br><br>Accordingly, having rejected the Counterclaim Defendant's constructions to the extent they may have any practical consequence, the Court finds that there is no substantive dispute over this limitation. |
| said planar members being *thin at their initial locations* of entry into said slots and said planar members being continuous with a *member of a larger thickness* at locations spaced from said initial locations so that entry in said slots is facilitated by said initial locations being *significantly thinner* than the width of said slots. | The Court adopts Lexmark's construction, which arguably is no different that SCC's. However, SCC proposed construction falls victim to the aforementioned problem of "synonym gloss," which tends to make meanings more ambiguous than clear. Lexmark largely simply states the claim itself, because there is really no substantive dispute over the meaning of this claim. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| 2. The cartridge as in claim 1 in which each said planar member is plastic molded as a *unitary* member including the body of said cartridge from which each said planar member extends. | Construction: unitary means single, but "indivisible" could be too limiting and is thus rejected as a construction. |
| **E. U.S. Patent No. 5,802,432 ("Pin/Spring Assembly")** | |
| 1. A toner cartridge comprising | Parties agree: No construction is necessary. |
| a first unitary element comprising *hand grip* at the top front end; a cleaner chamber at the rear end; and left and right side walls, each said side wall having a housing for loosely receiving a stud positioned in said housing; said element having openings near said chamber to mount a photosensitive roller, | The term appears to speak for itself, except that SCC's construction would require the hand grips to be "along the width of the cartridges with holes that provide room for the fingers of a person to grasp." Lexmark claims that this construction improperly imposes limitations. Nevertheless, SCC's construction is supported by Lexmark's preferred embodiment, and even though claims are not limited to the preferred embodiment, the specification may support SCC's construction (even though the specification is only evidence of a claim limitations, rather than limiting itself).<br><br>The Federal Circuit has stated, "We recognize that there is sometimes a fine line between [properly] reading a claim in light of the specification, and [improperly] reading a limitation into the claim from the specification." *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed.Cir.1998). The Court believes to adopt SCC's construction would fall in the later category, and accordingly, Lexmark's construction—"a hand grip at the top of the toner cartridge that allows a user to handle it"—is hereby adopted. |
| a second unitary member comprising a toner hopper, a post and a stud extending from each side of said hopper, and *means* to mount a developer roller for rotation to receive toner from said hopper, | This is a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6. The structure for performing the function is construed (from the specification) to be a gear plate and equivalents thereof. Fig. 14; Col. 12, lines 64–66 ("[Gear Plate] has a . . . hole for shaft of developer roller.") Accordingly, SCC's construction is inappropriate and rejected. |
| a first spring connected between said post of the *left side* of said second unitary member and said left side wall, | SCC and the Remanufacturers submit that no construction is necessary. [R. 919 at 25]. Lexmark proposes that "left side" should have its "plain and ordinary meaning," but does not address this claim limitation in its opening brief [R. 949 at 77] or response brief [R. 1010 at 34]. Given Lexmark's assertion that "right side" requires "no further construction," with respect to the limitation listed three rows below, the Court finds that the parties are in substantial agreement that "no construction is necessary." |
| a second spring connected between said post of the *right side* of said second unitary member and said right side wall, | *Id.* (the immediately preceding row, regarding "left side") |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| said stud of the *left side* of said cartridge positioned in said housing of said *left side* so as to be held by said housing of said *left side*, and | "Left side" speaks for itself. The Court can only assume (but does not find or hold) that SCC's construction, "region to the left of the center line," is merely a superfluous synonym for "left side." SCC chides Lexmark for "regurgitating" the claim language, but all SCC's "construction" does it slap lipstick on the proverbial pig. While SCC and the Re-manufacturers argue that the Court "must construe disputed terms," simply swapping words with synonyms is not construction. Therefore, the Court finds that the claim limitation is not in dispute at all. |
| said stud of the *right side* of said cartridge positioned in said housing of said *right side* so as to be held by said housing of said *right side*. | *Id.* (the immediately preceding row, regarding "left side") |
| 2. The cartridge as in claim 1 further comprising a flat ledge on the side of said hopper *unobstructed* for resting on a roller member in *said imaging apparatus*. | The Court finds there is no construction dispute over the limitation "unobstructed," as SCC's proposed construction of "not impeded by any structure" is not enlightening.<br><br>Why SCC finds it necessary for the Court to construe the word "imaging apparatus" as a "printer" here, in light of the myriad uncontested uses of the word "imaging apparatus" elsewhere, is anyone's guess. Nevertheless, it is hereby adjudged that "imaging apparatus" here means "printer." |
| **F. U.S. Patent No. 5,874,172 ("Developer Roller")** | |
| 1. An endless developer member comprising | Parties agree: No construction is necessary. |
| a body of polycaprolactone ester toluene-diisocyanate polyurethane, ferric chloride filler, a polydiene diol selected from the group consisting of polyisoprene diol and polybutadiene diol, and antioxidant which electrically stabilizes said member, | Parties agree: No construction is necessary. |
| said member having *an outer surface of oxidized segments of the polydiene diol*. | SCC's construction is that the claim should be construed to mean that the surface layer of oxidized polydiene diol has a thickness of 50–150 microns. Lexmark's joint construction proposal is that " 'outer surface' should be construed to mean 'the outside, exterior boundary.' " [R. 919 at 28].<br><br>The specification indicates that 50–150 microns is a desired result: "The desired electrical properties ... are ... a coating thickness of approximately 50–150 microns." Col. 2, lines 37–44. However, nothing suggests that 50–150 microns is an implicit limitation. Accordingly, the claim limitation is construed to mean an outer surface layer of oxidized polydiene diol (without regard to thinkness). |
| **G. U.S. Patent No. 5,875,378 ("Hopper Exit Agitator")** | |
| 1. A toner cartridge comprising a cylindrical hopper having an opening for delivering toner | Parties agree: No construction is necessary. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| out of said hopper said hopper having a lower wall extending from a bottom of said hopper to a location substantially above the bottom of said hopper to define a bottom of said opening, | |
| a paddle rotatable in said hopper to stir toner such that some toner will *move gently* toward said opening, | "softly changing position" (SCC's proposal) does nothing to construe "move gently toward said opening." The Court finds that "move gently" speaks for itself, and absent any indication to the contrary, SCC's proposed construction is superfluous; thus, this claim is not in dispute. |
| an exit surface to deliver toner from said hopper on the side of said lower wall opposite said hopper, said exit surface sloping downward during normal operation of said cartridge, | Parties agree: No construction is necessary. |
| an agitator member extending across said exit surface having a first pivot member *on one side of said exit surface* and a second pivot member on *an opposite side of said exit surface* and normally located proximate said exit surface except when moved by said paddle around said first pivot member and said second pivot member, | SCC's proposes that both phrases be construed to mean "attached to the exit surface." The claim does not require the attachment of the pivot members to the exit surface, and is accordingly construed to not require such. *See* Fig. 9, No. 65. |
| and an extension on said agitator member extending past said lower wall into the path of said paddle in said hopper when said paddle is rotated. | Parties agree: No construction is necessary. |

**H. U.S. Patent No. 5,995,772 ("Encoded Cartridge Wheel")**

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| 1. A cartridge for an electrophotographic machine, comprising: | Parties agree: No construction is necessary. |
| a sump for carrying an agitator *rotatably mounted* in said sump for engagement with a toner; | The claim is construed as follows: "the agitator is mounted in the sump in a manner such that it can be rotated." SCC's proposed construction, "supported to rotate with the encoded device," is inappropriate because it could impose an extraneous limitation that the agitator and the encoded device must rotate conjointly. |
| an encoded device *coupled* to a first end of said agitator; and | Coupling occurs via a shaft mounted in the sump. Beyond that, SCC's proposed construction of "fastened to" is a synonym that itself could require construction and does not enlighten the self-evident meaning of "coupled." |
| a torque sensitive coupling connected to a second end of said agitator, which is connectable to a drive mechanism of said machine; | Parties agree: No construction is necessary. |
| said encoded device having *coding means* representing *cartridge characteristic information*. | "[C]oding means" is a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6. Although the word "means" is not followed by function, it is apparent that the function here is "coding." The claim could equally read, "means for coding." Because the means is not followed by sufficient structure or material for performing the coding, this claim falls |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| | within § 112, ¶ 6. The structure/material for performing the coding, also the "coding indicators", is ostensibly (from the specification) "radially extending … slots or windows," Col. 8, lines 31–34, 43–44, or "reflective material," Col. 20, line 64–65, or notches and equivalents of the aforementioned. |
| | Cartridge characteristic information is construed as "information about the cartridge." Though it may not be necessary to construe this phrase, Lexmark states that it "has no issue with … [the] proposed construction … but notes that it adds nothing of value…." [R. 949 at 103]. |
| 2. The cartridge of claim 1, wherein said coding means includes coding readable to indicate *a component of resistance* to agitator movement through a portion of said sump having toner therein to give an indication of an amount of toner remaining in said sump. | SCC's construction, "to indicate resistence to agitator movement through the toner," appears to be no different than the plain meaning of the "to indicate a component of resistance to agitator movement through a portion of said sump having toner therein." Accordingly, the Court finds that this claim is not in dispute. To the degree that SCC may argue otherwise, SCC has failed to show that language. |
| 4. The cartridge of claim 1, wherein said coding means includes a coding representing *preselected cartridge characteristic information.* | See Claim 35 of the '169 **Patent**, *supra*; see also the '772 Patent, Col. 5, lines 52–58. |
| 5. The cartridge of claim 1, wherein said coding means comprises a plurality of *coding indicators.* | See claim 1 above, in which coding indicators are referenced. Claim 5 is not a means-plus-function limitation under § 112, ¶ 6 though. |
| 7. The cartridge of claim 5, wherein said plurality of coding indicators comprise a plurality of *slots*. | Calling slots "narrow openings" is not helpful (i.e. not "constructive" in any meaningful way). The Court finds no substantive dispute over this claim limitation. |
| 8. The cartridge of claim 5, wherein said plurality of coding indicators comprises a plurality of *windows*. | Calling windows "openings" is not helpful (i.e. not "constructive" in any meaningful way). The Court finds no substantive dispute over this claim limitation. |
| 9. The cartridge of claim 5, wherein said plurality of coding indicators comprise a plurality of *notches*. | Calling notches "v-shaped indentations" is not helpful (i.e. not "constructive" in any meaningful way). The Court finds no substantive dispute over this claim limitation. |
| 12. The cartridge of claim 5, wherein said plurality of coding indicators are *juxtaposed*. | Construing "juxtaposed" as "placed side by side is not helpful in construction and is potentially overly limiting. The Court finds no substantive dispute over this claim limitation. |
| 14. A cartridge for an electrophotographic machine, comprising: | Parties agree: No construction is necessary. |
| a sump for carrying a quantity of toner; | Parties agree: No construction is necessary. |
| a toner agitator mounted in said sump; and | Parties agree: No construction is necessary. |
| a single encoded *plate rotating in relation to said toner agitator,* | The Court finds that the Counterclaim Defendants' proposed construction of "plate," "a smooth flat piece of material," adds nothing to the construction. Why could the plate not |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| | be knurled? Intrinsic evidence may shed light on that point, but the Counterclaim Defendants merely stripped a definition out of the dictionary. That definition may comport with the preferred embodiment, but the parties know that the preferred embodiment is not limiting; only the claims themselves are. |
| | "Rotating in relation to said toner agitator" is construed to have no limits on duration (i.e. not limited to the times when the agitator "passes through the toner") and has no limits on direction of rotation (i.e. the plate and agitator do not have to rotate conjointly). |
| said encoded plate including *coding means* for determining a quantity of toner in said cartridge. | See claim 1 above. |
| 15. The cartridge of claim 14, wherein said coding means comprises at least one *coding indicator*. | See claim 1 above, in which coding indicators are referenced. Claim 15 is not a means-plus-function limitation under § 112, ¶ 6 though. |
| 16. The cartridge of claim 14, wherein said coding means comprises a plurality of *coding indicators*. | *Id.* at Claim 15. |
| 17. The cartridge of claim 16, wherein said coding indicators comprise a plurality of *openings* in said encoded plate. | The parties agree and the Court concurs: "the coding indicators include a plurality of openings in the encoded plate." |
| 18. The cartridge of claim 16, wherein said coding indicators comprise a plurality of *notches* in said encoded plate. | See claim 9 above. |
| 20. The cartridge of claim 16, wherein said coding indicators are *juxtaposed* around an axis of rotation of said encoded plate.[1]<br><br>[[1] "Coding means" limitation is not present in claims 20 or 21 of this patent.] | See claim 12 above. |
| 22. A cartridge for an imaging apparatus, the improvement comprising an encoded *plate* having *coding means* representing *preselected cartridge characteristic information*. | See claims 1, 4, and 14 above. |
| 23. The cartridge of claim 21, wherein said coding means comprises a plurality of *coding indicators*. | See claim 1 above, in which coding indicators are referenced. Claim 23 is not a means-plus-function limitation under § 112, ¶ 6 though. |
| 24. The cartridge of claim 23, wherein said coding indicators comprise a plurality of *openings* in said encoded plate. | See claim 17 above. |
| 25. The cartridge of claim 23, wherein said coding indicators comprise a plurality of *notches* in said encoded plate. | See claim 9 above. |
| 32. The cartridge of claim 22, wherein said encoded plate further comprises coding for determining a *quantity of toner carried* by said cartridge. | The parties agree and the Court concurs: "coding for determining a quantity of toner carried by the cartridge." |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| 33. A replaceable cartridge for an electrophotographic machine, said cartridge comprising: | Parties agree: No construction is necessary. |
| a sump for carrying a quantity of toner; | Parties agree: No construction is necessary. |
| an agitator *mounted for rotation* into, through and out of engagement with toner carried within said sump; | See claim 1 above. |
| an encoded plate *coupled* to said agitator, said encoded plate being positioned for mating coaction with an encoded plate reader and said encoded plate including *code indicating means* configured for representing *cartridge characteristic information*; and | See claim 1 and 14 above. |
| a torque sensitive coupling connected at a first end to said agitator and having a second end for connection to a drive mechanism in said machine, which when said cartridge is installed in said machine, *effects rotation of said agitator and encoded plate.* | The Court agrees that "the torque sensitive coupling [must] be such that when the cartridge is installed in a printer [the coupling] results in some type of rotation of both elements." [R. 949 at 117]. While SCC might describe what actually happens in its proposed construction—namely that the coupling causes "the encoded plate [to] rotate[ ] with and in the same direction as the agitator as it passes through the toner"—the proposed construction is overly limiting and rejected. |
| 34. The replaceable cartridge of claim 33, wherein said code indicating means comprises a *plurality of openings* in said encoded plate. | See claim 17 above. |
| 39. A method of determining said quantity of toner in said cartridge of claim 33, comprising the steps of: | Claim 39 is not an asserted claim in this case; nevertheless, the parties agree that no construction is necessary. |
| *determining a rotational position* of said drive mechanism; | Claim 39 is not an asserted claim in this case; accordingly, no construction is necessary. [*See* R. 1008 at 32]. |
| *determining a relative position* of encoded plate; and | Claim 39 is not an asserted claim in this case; accordingly, no construction is necessary. [*See* R. 1008 at 32]. |
| measuring the lag between said rotational position of said drive mechanism and said relative rotational position of said encoded plate. | Claim 39 is not an asserted claim in this case; nevertheless, the parties agree that no construction is necessary. |
| **I. U.S. Patent No. 6,009,291 ("Photo Drum Clutch")** | |
| 1. An apparatus for electrophotographic imaging comprising | Parties agree: No construction is necessary. |
| a *photosensitive roller assembly* mounted for rotation in said apparatus, | It is the law of the case that this term is not indefinite. The Counterclaim Defendants failed to raise its indefiniteness contention when Lexmark moved for summary judgement that this claim is valid. [R. 1008]. |
| a gear integral with said assembly for receiving torque from a *meshing gear* to cause said rotation of said assembly during imaging, and | "Meshing gear" is a gear in a printer, unclaimed in this limitation. The claim is construed to reference meshing gear for the sole purpose of defining the purpose of "a gear integral with said assembly . . . ." |
| a *uniform frictional drag element* in contact with said assembly at a location which receives torque from said gear integral with | The Court adopts, in part, SCC's construction: "a mechanism in which one end of a spring is prevented from rotating, thereby, as |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| said assembly, said drag element applying friction forces which oppose said rotation. | is conventional, permitting the spring to wind tight or unwind depending on the rotation of a shaft on which the spring is wound." Lexmark argues that this construction imports limitations from the specification. The Court disagrees, and finds that the specification is merely confirmative evidence that the claim is limited in the manner in which SCC proposes (absent a grease requirement). See Fig. 12, in which the coil spring clutch is the only frictional drag element disclosed anywhere (see Claim 2, regarding the coil spring clutch). SCC also argues that the specification regarding grease—"The drag from element is uniform because of the grease"— requires the mechanism to be in combination with grease. Col. 9, lines 58–61. The Court disagrees. "Uniform" describes "frictional drag," not "element." The structure itself must not be greased to be claimed. |
| 2. An apparatus for electrophotographic imaging comprising | Lexmark: "No construction necessary." SCC/Remanufacturers: No response. Accordingly, No construction necessary. |
| a *photosensitive roller assembly* mounted for rotation in said apparatus on a central shaft, said assembly having a stud surrounding said central shaft, | See claim 1 above. |
| a gear integral with said assembly for receiving torque from a *meshing gear* to cause said rotation of said assembly during imaging, said rotation transmitting torque to said stud, and | See claim 1 above. |
| a *coil spring clutch* wound around said stud, the direction of winding of said spring being that which unwinds said spring during said rotation. | Construction: "a mechanism in which one end of the spring is prevented from rotating, thereby, as is conventional, permitting the spring to wind tight or unwind depending on the rotation of a shaft on which the spring is wound." This is a verbatim recital of the definition of "coil spring clutch" in the specification. Col. 2, lines 51–55. The Court rejects Lexmark's argument that construing a term according to its definition outlined in the specification, at least under these circumstances, improperly imports limitations into the claim. Lexmark's argument degrades the high evidentiary weight that should be afforded the specification to determine limits embodied in the claim itself. Nevertheless, "grease" is irrelevant to the claim limitation. *Cf.* Claim 1 above. |

**J. U.S. Patent No. 6,160,073 ("Sealant Material")**

| 1. A toner cartridge comprising *pliable polyorganosiloxane sealant* comprising structural units of the formulae:<br><br>[Formula Deleted; See R. 919 at 46] | The specification clearly speaks of two types of copolymer. The first is a wax that is not fit for use as a sealant. *See* Col. 12, line 32—Col. 13, line 35; Col. 8, line 19–21 ("Rather than a wax, which is the consistency of the previously described copolymer, the |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| wherein (i) each R is independently a $C_1$ -$C_6$ alkyl (ii) each $R_1$ is independently selected from the group consisting of a $C_2$ -$C_{14}$ alkyl and a $C_{15}$ -$C_{60}$ alkyl, with the proviso that from about 70% to about 100% of all $R_1$ groups are $C_{15}$ -$C_{60}$ alkyl, and (iii) $\times$ represents from about 0 to about 99.5 mole percent, and y represents from about 0.5 to about 100.0 mole percent of the silicone copolymer, based on total moles of the silicone copolymer. | copolymer *useful as a sealant* has the consistency of a paste or pliable caulk." (emphasis added)). The second copolymer, the only copolymer useful as a sealant according to the specification, is the subjec of claim 1. Col. 13, lines 38–39. Otherwise the word "sealant" would lose meaning in the claim. A "pliable polyorganosiloxane *substance*" might be waxy or a paste or pliable caulk, but the specification makes clear that it is limited to a "pliable polyorganosiloxane *sealant*." The sealant version has the consistency of a paste or pliable caulk, so the claim is construed as follows: "polyorganosiloxane having the consistency of a paste of pliable caulk." This is not inconsistent with *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.1988), because the Court does not impose a consistency requirement; rather "sealant" should be construed to have effect, and that effect is that the sealant is not the wax copolymer outlined in the specification. |

**K. U.S. Patent No. 6,300,025 ("Photoconductor Drum")**

| | |
|---|---|
| 1. A photoconductive member comprising: a conductive substrate, | Parties agree: No construction is necessary. |
| and *a charge generation layer on said substrate comprising a thorough mixture of phthalocyanine pigment, polyvinylbutyral, a methyl or phenyl polysiloxane, and a phenolic resin,* | The parties' competing constructions, and thus dispute, boil down to whether the elements of the substrate "are only physically combined and chemical interaction between or among them does not occur" (Counterclaim Def.s' version) or whether "each chemical component in the layer essentially retains its own properties" (Lexmark's version). The Court adopts Lexmark's construction. There is no basis for foreclosing chemical interaction between the chemicals, when a mixture merely requires that the chemicals "retain their own properties." *http://mw1.merriam-webster.com/dictionary/mixture.* (Although the dictionary is a disfavored source of evidence in light of intrinsic evidence, when the intrinsic evidence does not favor one interpretation or another per se, the dictionary may be consulted as a source of external evidence. *Phillips*, 415 F.3d at 1322–23.) Lexmark's construction is additionally consistent with the specification. Although the specification states that "mixtures are shown not to generate any new chemically cross-linked materials," [R. 1025 at 15 (citing Col. 4, 65–67) ], the specification, and more importantly, the claim itself, does not indicate that a chemical interaction *must not* be had; rather, the critical limitation is that the chemicals retain their own properties. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| said polyvinylbutyral, said polysiloxane, and said phenolic resin being a binder for said pigment, | Parties agree: No construction is necessary. |
| the amount by weight of said phenolic resin being in the range of 1 to 20 percent of the total weight of said polyvinylbutyral, said polysiloxane, and said phenolic resin | Parties agree: No construction is necessary. |

**L. U.S. Patent No. 6,397,015 ("Encoded Cartridge Wheel")**

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| 1. An encoded device for a toner cartridge comprising a *plate*. . . . | The Court finds that the Counterclaim Defendants' proposed construction of "plate," "a smooth flat piece of material" adds nothing of a constructive value. Why could the plate not be knurled? Intrinsic evidence may shed light on that point, but the Counterclaim Defendants merely stripped a definition out of the dictionary. That definition may comport with the preferred embodiment, but the parties know that the preferred embodiment is not limiting; only the claims themselves are. |
| . . . having *preprogrammed indicia* positioned at locations defined in relation to a clock face, | Construction: "preprogrammed indicia" include slots, windows, or openings |
| said preprogrammed indicia including a *start indicia* . . . | Construction: "a referenced point of origin from which measurements are made." Fig. 7 |
| . . . positioned *at about a 6:00 o'clock position* and | SCC's construction, "at or approaching exactly the 6:00 o'clock position of a clock face," is not a satisfying way to narrow the word "about." "About" is sufficient here, because any given numerical value—20 mm past the 6 o'clock position, for instance—can both be called "about" or "approaching exactly." |
| at *least one measurement indicia located between about 200 degrees and about 230 degrees from said 6:00 o'clock position.* | *Id.* (the immediately preceding claim construction). Measurement indicia also speaks for itself. Calling it a "point" adds nothing of value for construction purposes. |
| 2. The encoded device of claim 1, wherein said start indicia is positioned between *about a 5:00 o'clock position* and said 6:00 o'clock position. | See claim 1 above. |
| 3. The encoded device of claim 1, wherein each said indicia comprises a *slot*. | calling slots "narrow openings" is not helpful (i.e. not "constructive" in any meaning way). The Court finds no substantive dispute over this claim limitation. |
| 5. The encoded device of claim 1, further comprising at least one *preselected cartridge characteristic indicia* positioned between said start indicia and said at least one measurement indicia. | See Claim 35 of the '169 Patent, *supra*; see also '015 Patent, Col. 5, lines 47–53. |
| 6. The encoded device of claim 1, further comprising at least one *preselected cartridge characteristic indicia* positioned between said start indicia and said at least one measurement indicia in a clockwise direction from said 6:00 o'clock position. | See Claim 5 above. |
| 8. The encoded device of claim 1, wherein each of said at least one measurement indicia | calling slots "narrow openings" is not helpful (i.e. not "constructive" in any meaning way). |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| comprises a _slot_. | The Court finds no substantive dispute over this claim limitation. |
| 10. The encoded device of claim 1, wherein said toner cartridge includes a _sump for carrying a supply of toner_ and | See claim 1 of the '169 patent above. |
| _an agitator rotatably mounted in said sump,_ | The claim is construed as follows: "the agitator is mounted in the sump in a manner such that it can be rotated." SCC's proposed construction, "supported to rotate with the encoded device," is inappropriate because it could impose an extraneous limitation that the agitator and the encoded device must rotate conjointly. |
| said agitator having a first end and a second end, said plate being _coupled_ to said first end of said agitator and a torque sensitive coupling being coupled to said second end of said agitator. | Coupling occurs via a shaft mounted in the sump. Beyond that, SCC's proposed construction of "fastened to" is a synonym that itself could require construction and does not enlighten the self-evident meaning of "coupled." |
| 11. An encoded device for a toner cartridge comprising a plate having _preprogrammed indicia_ positioned at locations defined in relation to a clock face, | See claim 1 above. |
| said preprogrammed indicia including a first _slot_ ... | Calling slots "narrow openings" is not helpful (i.e. not "constructive" in any meaningful way). The Court finds no substantive dispute over this claim limitation. |
| ... positioned _at about a 6:00 o'clock position_ and having a first extent, and | See claim 1 above. |
| a measurement slot positioned _at between about 200 degrees and about 230 degrees_ from said 6:00 o'clock position, said measurement slot having a second extent, said first extent being greater than said second extent. | See claim 1 above. |
| 13. The encoded device of claim 11, further comprising at least one _preselected cartridge characteristic indicia_ positioned between said first slot and said measurement slot. | See claim 5 above. |
| 14. The encoded device of claim 11, wherein said toner cartridge includes a _sump for carrying a supply of toner_ and _an agitator rotatably mounted in said sump_, said agitator having a first rotating end and a second rotating end, said plate being adapted for _coupling_ to said first rotating end of said agitator. | See claim 10 above. |
| 15. The encoded device of claim 14, wherein said second end of said agitator is _coupled_ to a torque sensitive coupling. | See claim 1 of the '772 patent above. |
| 17. An encoded wheel for a toner cartridge comprising a disk having _indicia_ positioned at locations on said disk, said indicia including a _start indicia,_ and _at least one measurement indicia located between about 200 degrees and about 230 degrees_ from said start indicia. | See claim 1 above. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| 18. The encoded device of claim 17, wherein each said indicia comprises a _slot_. | Calling slots "narrow openings" is not helpful (i.e. not "constructive" in any meaningful way). The Court finds no substantive dispute over this claim limitation. |
| 20. The encoded device of claim 17, further comprising at least one _preselected cartridge characteristic indicia_ positioned between said start indicia and said at least one measurement indicia. | See claim 5 above. |
| 21. The encoded device of claim 17, further comprising at least one _preselected cartridge characteristic indicia_ positioned between said start indicia and said at least one measurement indicia in a clockwise direction from said start indicia. | See claim 5 above. |
| 23. The encoded device of claim 17, wherein each of said at least one measurement indicia comprises a _slot_. | Calling slots "narrow openings" is not helpful (i.e. not "constructive" in any meaningful way). The Court finds no substantive dispute over this claim limitation. |
| 24. The encoded device of claim 17, wherein said toner cartridge includes a _sump for carrying a supply of toner_ and _an agitator rotatably mounted in said sump_, said agitator having a first end and a second end, said disk being _coupled_ to said first end of said agitator and a torque sensitive coupling being coupled to said second end of said agitator. | See claim 10 above. |
| **M. U.S. Patent No. 6,459,876 ("Dual Paddle Toner Agitator")** | |
| 1. A toner cartridge comprising: | Parties agree: No construction is necessary. |
| a toner reservoir having toner therein; | Parties agree: No construction is necessary. |
| a first paddle rotatable in said toner reservoir about a fixed first axis; | Parties agree: No construction is necessary. |
| said toner reservoir having a first portion in which the toner therein is engaged by said first paddle to agitate the toner and to _push the toner_ out of said toner reservoir during each revolution of said first paddle; | "Exerts pressure on the toner" does nothing to construe "push the toner," except to imply a limitation, namely a "pressure" requirement, beyond the claim. "Push the toner" speaks for itself, and the Court finds that this limitation is not substantially in dispute. |
| a second paddle pivotally supported on said first paddle for pivotal movement about a second axis substantially parallel to the fixed first axis in response to each revolution of said first paddle about the fixed first axis; | Parties agree: No construction is necessary. |
| said _toner reservoir having a second portion in which the toner therein is not engaged by said first paddle during each revolution of said first paddle about the fixed first axis_; | The Court construes this claim to permit contact between the first paddle and toner in the second portion of the toner reservoir. While said contact may not be a desired result, nothing about the limitation suggests that contact between the first paddle and toner in the second portion of the toner reservoir cannot or does not ever happen. Because SCC's proposed construction suggests otherwise, it is rejected. |
| and said second paddle including a toner moving element for moving through said second portion of said toner reservoir in response to | See claim 1 above. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| each revolution of said first paddle through said toner reservoir to engage the toner in said second portion of said toner reservoir to agitate the toner and to *push the toner* out of said toner reservoir *during each revolution of said first paddle.* | |
| 5. The toner cartridge according to claim 4 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said toner reservoir. | This is a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6. The structure for performing the function is a stepped pivot shaft and support arms as well as equivalents thereto. The Counterclaim Defendants construction is rejected, because it requires "support arms on the second paddle that are longer than the radius of the inner surface of the longitudinal wall." Rather, said support arms *in combination with the mating structure of the first paddle* should be longer than the radius of the inner wall. [R. 949 at 137–38]; Fig. 2. Under the Counterclaim Defendants' construction, with reference to Fig. 2, the support arms at Nos. 41 and 42 would have to be longer than support struts, illustrated at No. 29, which run the length of the "mating structure." This construction would be in error. |
| 6. The toner cartridge according to claim 3 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said *toner reservoir.* | See claim 5 above. |
| 7. The toner cartridge according to claim 2 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said *toner reservoir.* | See claim 5 above. |
| 8. The toner cartridge according to claim 1 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said *toner reservoir.* | See claim 5 above. |
| 10. A toner cartridge comprising: | Parties agree: No construction is necessary. |
| a toner reservoir having toner therein | Parties agree: No construction is necessary. |
| a first paddle rotatable in said toner reservoir about a fixed first axis; | Parties agree: No construction is necessary. |
| said toner reservoir having a first portion in which the toner therein is engaged by said first paddle to agitate the toner and to *push the toner* out of said toner reservoir during each revolution of said first paddle; | See claim 1 above. |
| a second paddle pivotally supported by said first paddle for pivotal movement about a second axis substantially parallel to the fixed first axis in response to each revolution of said first paddle about the fixed first axis; | Parties agree: No construction is necessary. |
| said *toner reservoir having a second portion in which the toner therein is not engaged by* | See claim 1 above. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| *said first paddle during each revolution of said first paddle about the fixed first axis*; | |
| said second paddle having a toner moving element for moving through said second portion of said toner reservoir in response to each revolution of said first paddle through said toner reservoir to engage the toner in said second portion of said toner reservoir to agitate the toner and to push the toner out of said toner reservoir during each revolution of said first paddle; | Parties agree: No construction is necessary. |
| said first paddle having a first toner moving element for engaging only the toner in said first portion of said toner reservoir; | Parties agree: No construction is necessary. |
| said toner reservoir having a third portion adjacent said second portion and remote from said first portion; | Parties agree: No construction is necessary. |
| said first paddle having *a second toner moving element for engaging only the toner in said third portion of said toner reservoir during each revolution of said first paddle about the fixed first axis*; | The claim is construed as follows: "the first paddle has a second toner moving element that—during each revolution of the first paddle about its axis—engages only the toner in the third portion of the toner reservoir." Because SCC's construction potentially improperly limits the claim as requiring that the second toner moving element not contact any toner in any other portion of the toner reservoir, that construction is rejected. See claim 1 above. |
| and said toner moving element of said second paddle also *simultaneously* moving through said third portion of said toner reservoir in response to each revolution of said first paddle through said toner reservoir to engage the toner in said third portion of said toner reservoir to agitate the toner and to push the toner out of said toner reservoir during each revolution of said first paddle. | "At the same time" does not inform the plain meaning of "simultaneously." It is mere gloss, and absent a reason why "at the same time" has any significance beyond letting the word "simultaneously" stand on its own, the Court finds that this limitation is not actually in dispute. |
| 14. The toner cartridge according to claim 13 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said toner reservoir. | See claim 5 above. |
| 15. The toner cartridge according to claim 12 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said toner reservoir. | See claim 5 above. |
| 16. The toner cartridge according to claim 11 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said toner reservoir. | See claim 5 above. |
| 17. The toner cartridge according to claim 10 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said toner reservoir. | See claim 5 above. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
| --- | --- |
| 18. A toner cartridge comprising: | Parties agree: No construction is necessary. |
| a toner reservoir having toner therein; | Parties agree: No construction is necessary. |
| said toner reservoir including a plurality of walls; | Parties agree: No construction is necessary. |
| said plurality of walls including: a pair of substantially parallel end walls; | Parties agree: No construction is necessary. |
| and a longitudinal wall extending between said end walls and joined to each of said end walls; | Parties agree: No construction is necessary. |
| *each of said end walls having a circular shape of the same radius*; | The *only* evidence SCC gives for its proposed construction, "each end wall is round and the same size and shape," is general dictionary definitions that *could* impose extraneous limitation on the claim. It appears pointless to swap the word "circular" for "round," etc., and the Court finds that this claim limitation is not in substantive dispute. |
| said longitudinal wall including: a first portion having a curved shape extending longitudinally from one of said end walls toward the other of said end walls, said curved shape of said first portion having the same radius as the circular shape of each of said end walls but terminating prior to completion of the circular shape of each of said end walls; | Parties agree: No construction is necessary. |
| a second portion extending from said first portion toward the other of said end walls; | Parties agree: No construction is necessary. |
| and a third portion extending from said second portion to the other of said end walls; | Parties agree: No construction is necessary. |
| said first portion of said longitudinal wall having a substantially greater length than said second portion of said longitudinal wall; | Parties agree: No construction is necessary. |
| said second portion of said longitudinal wall having a substantially greater length than said third portion of said longitudinal wall; | Parties agree: No construction is necessary. |
| a first paddle rotatable in said toner reservoir about a fixed first axis, said first paddle being rotatably supported by said end walls; | Parties agree: No construction is necessary. |
| said first paddle having a clearance from each of said end walls and said longitudinal wall during rotation of said first paddle through said toner reservoir; | Parties agree: No construction is necessary. |
| a second paddle pivotally supported on said first paddle for pivotal movement about a second axis substantially parallel to the fixed first axis in response to rotation of said first paddle about the fixed first axis; | Parties agree: No construction is necessary. |
| each of said second portion and said third portion of said longitudinal wall including: a curved portion having the same shape as said curved shape of said first portion of said longitudinal wall but of less circumference; | Parties agree: No construction is necessary. |
| and a non-curved portion closer to the fixed first axis than said curved portion of each of | Parties agree: No construction is necessary. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| said second portion and said third portion of said longitudinal wall; | |
| said curved portion of each of said second portion and said third portion of said longitudinal wall having the same radius as the circular shape of each of said end walls; | Parties agree: No construction is necessary. |
| said longitudinal wall having an exit port formed therein; | Parties agree: No construction is necessary. |
| said second paddle having a toner moving element for moving through said toner reservoir having said second and third portions of said longitudinal wall, said toner moving element of said second paddle engaging said second and third portions of said longitudinal wall of said toner reservoir to engage the toner therein to agitate and push the toner out of said toner reservoir through said exit port; | Parties agree: No construction is necessary. |
| and said first paddle having a first toner moving element for engaging the toner in said toner reservoir along said first portion of said longitudinal wall of said toner reservoir during each revolution of said first paddle to agitate and push the toner out of said toner reservoir through said exit port. | Parties agree: No construction is necessary. |
| 25. The toner cartridge according to claim 24 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said toner reservoir. | See claim 5 above. |
| 26. The toner cartridge according to claim 18 including *means* for insuring that said second paddle trails said first paddle during each revolution of said first paddle through said toner reservoir. | See claim 5 above. |
| 28. An auxiliary paddle for use in a toner reservoir of a toner cartridge of a laser printer in cooperation with a main paddle revolving in the toner reservoir to aid in removing toner from *a portion of the toner reservoir that the main paddle cannot remove the toner* including: | This is a preamble, the contested portion of which merely states the purpose of or intended use of the auxiliary paddle. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed.Cir.1998). Therefore, the preamble is not a claim limitation requiring construction. *Id.*; *see also NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305–06 (Fed.Cir. 2005). The "purpose" portion of this preamble is not essential to "give life" to the claim. |
| a pair of substantially parallel support arms for pivotal support by the main paddle for pivotal movement relative to the main paddle during each revolution of the main paddle; | Parties agree: No construction is necessary. |
| an outer toner moving bar for engaging the toner to be moved out of the toner reservoir; | Parties agree: No construction is necessary. |
| said outer toner moving bar being supported by said support arms and extending beyond an outer side of one of said support arms to sweep *a volume greater than the volume swept by the portion of said outer toner moving bar between said support arms*; | The Court adopts the Counterclaim Defendants' construction: "the portion of the outer toner moving bar outside the support arms sweeps more toner than that swept by the portion of the outer toner moving bar between the support arms." Lexmark's argu- |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| | ment that "volume" could refer to anything other than "volume of toner," given the context of this claim and the patent, is unpersuasive. [R1010 at 81]. |
| and a stop pin supported by said support arms and extending beyond an outer side of each of said support arms for engaging the main paddle to control when said auxiliary paddle begins sweeping the volume in the toner reservoir during each revolution of the main paddle through the toner reservoir. | Parties agree: No construction is necessary. |
| **N. U.S. Patent No. 6,487,383 ("J–Seal")** | |
| 1. A sealing member for an image forming apparatus including a frame member, a developer roll and a blade member, structured so as to prevent leakage of toner in the image forming apparatus, said sealing member being made from a flexible, low modulus material and comprising: | Parties agree: No construction is necessary. |
| a rotary seal portion for sealing a space formed between the frame member and the developer roll, said rotary seal portion incorporating ridges set at an angle across its face adjacent to the _surface of said developer rolls_, said ridges being from about 0.05 to about 0.5 millimeters in height and running at an angle to the developer roll process direction so as to push toner away from _the edge of said developer roll_ as said developer roll rotates; | "[S]urface of said developer roller" speaks for itself; however, the Court specifically construes this limitation by rejecting the Counterclaim Defendants' proposed construction, which is "exterior of rotating cylinder immersed in toner for a portion of its revolution and exposed external to the developer unit for the other portion of the cycle." This construction would add much uncalled-for limitation to the claim, such as immersion in toner for a portion of the revolution. But it also appears that the Counterclaim Defendants are limiting the developer roller in its construction, when the subject of this limitation is a rotary seal portion, which is merely adjacent to the surface of the roller. To limit the roller itself simply exceeds the subject of this limitation. |
| a blade seal portion for sealing a space formed between the frame member and the blade member; and | Parties agree: No construction is necessary. |
| a _means_ for biasing said sealing member toward the surface of _said rotary member_ and said blade member | This is a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6. The biasing structure can be a "cantilever beam, cantilever springs or a foam strip" and equivalents thereto. Fig. 4; Fig. 5; 3:4–6; 7:10–21. However, "equivalents" are any means "which hold[ ] the seal against the rotary member without impairing the rotation of the rotary member." Col. 7, lines 10–22. |
| 10. A process cartridge detachably mountable to an image forming apparatus, said process cartridge comprising: | Parties agree: No construction is necessary. |
| a frame member; | Parties agree: No construction is necessary. |
| a developer roll mounted on said frame member; said developer roll constituting process means; | Parties agree: No construction is necessary. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| a blade member *elastically contracting said rotary member*; and | The Court concurs that, given the nature of the patent, with regard given to the specification and claim itself, that the use of the word "contracting" is a typographical error, and the claim should be read as using the word "contacting." (emphasis added). See, e.g, Col. 3, lines 14–15. It is absurd to read into the patent that the rotary member is contracted by the blade member. See Fig. 3, Nos. 10e and 10d.<br><br>The use of the words "rotary member" is additionally not indefinite, nor could a reasonable person so find. The preferred embodiment may be seen at Fig. 3, No. 10d. Nevertheless, any indefiniteness arguments with regard to the claims in issue in the '383 patent are moot, for the Counterclaim Defendants failed to raise indefiniteness contentions in response to a motion for summary judgment by Lexmark on, *inter alia*, the '383 patent's validity. [R. 1008]. |
| a sealing member to prevent leakage of toner from the cartridge, said sealing member being made from a flexible, low modulus material, said sealing member comprising: | Parties agree: No construction is necessary. |
| a rotary seal portion for sealing a space formed between the frame member and the developer roll, said rotary seal portion incorporating ridges set at an angle across its face adjacent to the *surface of said developer roll*, said ridges being from about 0.05 to about 0.5 millimeters in height and running at an angle to the developer roll process direction so as to push toner away from the edge of said developer roll in use; | See claim 1 above. |
| a blade seal portion for sealing a space formed between the frame member and the blade member, and | Parties agree: No construction is necessary. |
| a *means* for biasing said sealing member toward the surface of *said rotary member* and said blade member. | See claim 1 above. |
| 19. A process cartridge detachably mountable to an image forming apparatus, said process cartridge comprising: | Parties agree: No construction is necessary. |
| a frame member; | Parties agree: No construction is necessary. |
| a developer roll mounted on said frame member; said developer roll constituting process means; | Parties agree: No construction is necessary. |
| a blade member *elastically cont[ ]acting said rotary member*; | See claim 10 above. |
| a sealing member to prevent leakage of toner from the cartridge, said sealing member being made from a flexible, low modulus material, said sealing member comprising: | Parties agree: No construction is necessary. |
| a rotary seal portion for sealing a space formed between the frame member and the | See claim 1 above. |

| CLAIM LIMITATION | COURT'S CONSTRUCTION |
|---|---|
| developer roll, said rotary seal portion incorporating ridges set at an angle across its face adjacent to the *surface of said developer roll,* said ridges running at an angle of about 10° to the developer roll process direction so as to push toner away from the edge of said developer roll in use; | |
| a blade seal portion for sealing a space formed between the frame member and the blade member, and | Parties agree: No construction is necessary. |
| a *means* for biasing said sealing member toward the surface of *said rotary member* and said blade member. | See claim 1 above. |

Having considered the parties' claim construction pleadings, it is hereby **ORDERED** that said claim limitations in issue are construed or the issues pertaining thereto otherwise disposed of in accordance with the above table.